[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 70 
Respondent and appellant, Pontiac Trust Company, was appointed on October 6, 1930, administrator of the estate of William A. Culhane, who died intestate on July 25, 1930. Petitioners and appellees are three aunts of the deceased and are his heirs at law. The estate consisted largely of cash amounting to about $100,000 then on deposit in banks in Clarkston, Bay City and Detroit. The controversy has to do with two money items shown in the administrator's final account, both at the time on deposit in the Pontiac Commerical Savings Bank: $80,535 being in a savings account designated "Pontiac Trust Company, Administrator of the estate of William A. Culhane, deceased," and $7,297.33 in a commercial account, with considerable other moneys belonging to other trusts and estates, standing in the name of Pontiac Trust Company.
All of the directors of the trust company are directors of the bank, and the stockholders of the two institutions are identical, each holder of four shares of bank stock automatically owning one share of trust company stock, the certificate being joint and signed by the officers of both corporations. While the trust company occupies its own quarters *Page 72 
adjoining the bank, the two rooms are connected by an open second floor called the mezzanine.
Prior to the filing of the final account a tragedy occurred which affected the entire city of Pontiac, which like other industrial centers of the nation was suffering from the rapidly changing banking and business conditions of the country. The deposits of the bank had shrunk from $20,624,480.96 on August 5, 1929, to $15,695,872.47 on April 27, 1931. The unusual strain of responsibility, the killing by the police of an intruder in his home, the serious injury to several people by an elevator accident in the bank building, and a robbery of the bank in which an employee was implicated, all combined to accentuate the nervous condition of Cramer Smith, the president of the bank and the trust company. The city was shocked to learn late Saturday afternoon, June 6, 1931, that he had taken his own life. Thaddeus D. Seeley, a director, described him in the record as the most important person in the bank, if not the most important among the banking fraternity in the county.
Monday a run started on the bank, and in six days about three and a half million in cash was paid out to depositors, causing a further shrinkage in deposits of $1,862,620.56. The officers immediately invoked the 90-day clause on savings accounts and Saturday and Sunday the directors, meeting with the banking commissioner, decided not to reopen the following Monday.
The estate of Culhane was not alone affected; the closing left the entire community prostrated. Mr. John H. Patterson, a vice-president and chairman of both boards, had substantially as much of his own funds on deposit as well as those of estates of which he was either trustee or administrator, and *Page 73 
none of these were withdrawn during the run. The directors, many of whom are leaders in the city, made every effort to save the splendid financial structure they had built, and it is undisputed from the testimony that none of them believed other than that the sanity of the public would reassert itself and the bank remain open.
Petitioners alleging negligence on the part of the administrator, charging that its officers were cognizant of its weakened financial condition prior to the run, failed to protect the estate in depositing its funds in a bank in which it had an interest and permitting them to remain there during the run, prayed for an order of the probate court directing that the estate be closed and its funds and proceeds paid to the heirs at law.
The late Jesse H. Root, judge of the thirty-eighth judicial circuit, sitting as a probate judge, held the administrator personally liable for the funds in the commercial account, citing 11 R. C. L. p. 151, but absolved it from liability as to the savings funds. His written opinion finds there was nothing at the time of the original deposit to indicate other than that the bank was a good, sound, safe and solvent institution. Where would they be safe if withdrawn at the time of the run except in a deposit box? He asks and adds, "Who knows or can say?"
Petitioners appealed to the circuit where judge Charles E. White of the second judicial circuit again took testimony, resulting in a decree affirming that portion of the probate order which had to do with the commercial account liability, but reversing the part pertaining to the savings account, holding the administrator and its conservator liable for the entire amount shown in its final account, with interest at four per cent. on the savings funds. The *Page 74 
presiding circuit judge likewise filed an exhaustive opinion so that we have the benefit of able judicial discussions of opposite views of the problems presented by respondent's appeal.
Other than error claimed as to the admission of a letter from bank examiner Post to president Smith and portions of his testimony, the question is: Was the administrator negligent and is it personally liable for the balance of the deposits made by it in its affiliate bank?
We start with the law as stated in Re Grammel's Estate,120 Mich. 487, where we adopted Lord Hardwicke's language in Knight
v. Earl of Plymouth, 1 Dick. 120 (21 Eng. Rep. 214):
"If there is no mala fides, nothing wilful in the conduct of the trustee, the court will always favor him."
A trustee is required to use care and diligence in the handling of property. He may deposit it in a bank that has good standing and of whose stability he is honestly confident. Where there is evidence tending to show a reason for not investing it elsewhere, and raising a question of fact as to negligence, unless the record shows either negligence or its absence, as the case may be, we will not disturb the findings of the trier of the facts.
Our other fundamental is that stated by Mr. Justice COOLEY inSheldon v. Estate of Rice, 30 Mich. 296, 300 (18 Am. Rep. 136):
"It has been uniformly held that administrators, or other persons standing in the position of trustees, are not to be suffered, either directly or indirectly, to acquire interests in, or bargain for benefits from the property which, in their relation as trustees, they hold, manage, control or sell for others. They cannot occupy the position of buyers, *Page 75 
and, as such, interested to procure the property at the lowest possible price, when, as trustees, they are to make sale, and their duty requires them to obtain the highest price at which the property may be fairly sold. The law esteems it a fraud in such a trustee to take, for his own benefit, a position in which his interest will conflict with his duty (see cases cited). The reasons for this general rule are fully explained in several of the cases above cited, and it has been well said that 'the rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity:'Michoud v. Girold, 4 How. (45 U.S.) 555."
Mr. Justice POTTER, speaking recently for the court, stated the duties of trustees in Kelsey v. Detroit Trust Co.,265 Mich. 358, at page 362, and Mr. Justice NORTH pointed out inLawrence v. First National Bank Trust Company of Kalamazoo,266 Mich. 199, 205, that:
"In determining whether the trustee was guilty of negligence or violation of the trust duty, we must be governed by the circumstances of the particular case," and found there, as we do here, that there is no claim that respondent profited financially as a result of any transactions concerning which complaint is made.
The unusual circumstance presented in the instant case is the stockholder and director identity of the two financial institutions. Not quite so strongly, it is true, as that inGenesee Wesleyan Seminary v. United States Fidelity GuarantyCo., 247 N.Y. 52 (159 N.E. 720, 56 A.L.R. 964), but the observation of Chief Justice Cardozo is nevertheless important:
"Uncertain implication will not serve to justify a trustee in shaking off his duty as a fiduciary and assuming the absolute dominion appropriate to ownership. *Page 76 
If he wishes such dominion, he should ask for it, not covertly and indirectly, but unmistakably and frankly. * * * Public policy will not suffer us to be satisfied with less."
The language of the learned Justice in Meinhard v. Salmon,249 N.Y. 458, 464 (164 N.E. 545, 62 A.L.R. 1), is also applicable:
"Many forms of conduct permissible in the workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (Wendt v. Fischer, 243 N.Y. 439, 444
[154 N.E. 303]). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."
Where a trustee places itself in a position where self-interest conflicts with duty, its acts will be scanned with closer scrutiny than if made in the usual course of business. In re Jenkins' Estate, 260 Mich. 518.
Section 11901, 3 Comp. Laws 1929, provided the method whereby the bank might have acted as an administrator and 3 Comp. Laws 1929, § 12019, whereby the trust company might have done a banking business. Neither section was recognized in the handling of the funds of this estate. It may be argued that the statutes referred to are not applicable to separate corporate entities, but we have held *Page 77 
that where a corporation is so organized and controlled and its affairs are so conducted as to make it a mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored and the two corporations will be regarded in legal contemplation as one unit. People, ex rel. Attorney General, v. Michigan BellTelephone Co., 246 Mich. 198 (P. U. R. 1929 B, 455).
We cannot permit our sympathy for an already overburdened and distressed community, or our admiration for the courageous qualities of those who have given much in an endeavor to rehabilitate their financial institutions to sway us in applying the rules of law as we see and understand them.
The inseparable interests of the bank and trust company forces us to hold that the trustee could not be single minded in the discharge of its duty as administrator when it deposited and permitted trust funds to remain in a bank in which its stockholders and directors were identical. We agree with the opinion of the court below and like the learned trial judge can see no distinction between the case at bar and a case where a trustee uses the funds of a trust estate in his own private business. The question of good faith is not material and while there is no evidence in the record that the officers of the trust company acted in bad faith, it does show that for some time prior to the appointment of the administrator the affairs of the bank had been going down hill. The general rule that a trustee must exercise reasonable diligence and good faith (see 60 A.L.R. 489; Michigan Home Missionary Society v. Corning,164 Mich. 395, and In re Choate's Estate, 165 Mich. 420) does not prohibit him, on penalty of personal liability from depositing trust funds in a bank in which he is a stockholder or director. Nor does *Page 78 
community of ownership and management of the trust company and the bank constitute such identity of interest as to charge the trust company with use of the money in its own business. The separate corporate identities, however, need not be disregarded and the effect to be given the common ownership and operation of institutions is that it is one of the circumstances for consideration in determining the question of liability.
Through its officers and directors this trust company was in a position different from that of most corporate or personal trustees. It was in close touch with business and banking conditions and had a special knowledge of the status of its depository bank; one might almost say daily and continuous knowledge. When the original deposit was made the trustee knew that in the two previous years the deposits of the bank had decreased about 20 per cent. and its liquidity was below the 40 per cent. generally believed to be the standard for banks operating under similar conditions. It also knew that stock market conditions affecting liquidity were chaotic with a general falling tendency; and that little liquidity of loans was probable in the ordinary conduct of business. It is true it knew, or would be justified in assuming, that similar conditions existed as to banks in general and in good faith it could, and evidently did, assume that trust funds were as safe in its affiliated bank as anywhere else. Perhaps too, it thought them safe because of the opportunity to influence and control, through the interlocking directorate, the policy of the bank. But it is difficult to imagine upon what conception of reasonable diligence, as a trustee, the trust company could have believed that the deposit of trust funds in a savings account was proper under the circumstances in view *Page 79 
of the right of the bank to demand 90 days' notice before withdrawal. Even if we assume that the trust company was not guilty of lack of diligence when it made the deposit, it must be apparent that the circumstances imposed upon it a duty of special and active watchfulness and care.
A few months later, the trust company knew the liquidity of the bank had dropped to 22 per cent. and it had knowledge of the conference between the bank directors and the State banking examiners following an examination of the bank. Some of the identical directors further discussed the general situation with the State banking department and the department wrote a lengthy letter of criticism to the bank calling attention to the serious condition, which letter is herein referred to. Assuming the solvency of the bank, nevertheless the duty of the trustee to its trust estate is clear. The continuance of the deposit in the form of a savings account, subject to notice before withdrawal, was not an active and diligent management of the estate. The least it could have done in the discharge of its duty would have been not only to convert the money into immediately withdrawable funds, but also upon indication of further risk to actually withdraw the trust money.
The strenuous efforts of the directors to save the bank were laudable and fully acquit them of any charge of bad faith or wrongdoing, but after all their efforts had no assurance of success. The fate of the bank, and with it the trust funds, under these conditions rested upon hope for a recovery of business conditions and the belief that a run on the bank would not occur.
Had it not been for the continuous depreciation in the condition of the bank and had there been no *Page 80 
prior difficulty or reason to anticipate serious trouble, the run, following the death of Mr. Smith, might not have charged defendants with personal liability. But with all the danger signs appearing from conditions before the deposit was made and continuing with increasing peril thereafter, it would be depriving trust estates of reasonable protection if it were not held that in the instant case the trustee failed to use reasonable diligence to protect the trust.
The testimony of the examiner was admissible. 3 Comp. Laws 1929, § 11940, requiring information obtained by examiners to be kept secret is not intended to prevent testimony of State officers in the courts of the State under oath and upon due process. The letter of May 21st to which objection is made may not have been read by president Smith to his board; unfortunately, he was ill when it was received but it was read by the assistant cashier and its contents pertained to a discussion between the examiner and some 14 of the bank's officers and directors immediately following the examination and covered matters with which they were or should have been familiar. It may contain certain disputed questions but these either were or could have been called to the attention of both the acting probate judge and the presiding circuit judge. We find no error in its reception especially in view of the fact that the witness was merely relating his official acts and producing a part of the official records of his office.
The decree is affirmed, with costs to appellees.
NELSON SHARPE, C.J., and POTTER, NORTH, FEAD, WIEST, and EDWARD M. SHARPE, JJ., concurred. BUTZEL, J., did not sit. *Page 81