BALL v. SWEENEY.

1. Appeal and Error—Chancery Cases—De Novo Hearing—Credibility of Witnesses.

The Supreme Court hears chancery cases *de novo* but will ordinarily not reverse the lower court, where there is evidence and testimony to support its findings, unless justice demands it, or it can be said that the evidence clearly preponderates the other way, since the trial judge is in a better position to test the credibility of witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity.

2. Fraud—Land Contract—Resort Property—Rescission—Evidence.

Finding of trial court that defendant vendors of resort property had fraudulently concealed sewage difficulties between themselves and neighbors to the south and with the State department of health justifying rescission of the contract of purchase and return of plaintiffs' money *held*, proper, under evidence presented.

Appeal from Sanilac; Bach (Arthur M.), J. Submitted October 8, 1958. (Docket No. 17, Calendar No. 47,456.) Decided December 3, 1958.

Bill by Raymond R. Ball and Lillian M. Ball against L. Comer Sweeney and Marie A. Sweeney to rescind and cancel as fraudulent a contract for the purchase of resort property. Decree for plaintiffs. Defendants appeal. Affirmed.

References for Points in Headnotes
[1] 3 Am Jur, Appeal and Error § 913.
[2] 55 Am Jur, Vendor and Purchaser § 593.

*Leonard J. Paterson,* for plaintiffs.

*Atkins & Drillock,* for defendants.

KAVANAGH, J.  Defendants-appellants for several years owned and operated a resort north of Lexington on Lake Huron.  The resort consisted of a tract of land bordered on the west by highway US–25, and on the eastern side by Lake Huron frontage.  On the highway side there was a store which sold groceries, beer and wine to take out, gasoline, and oil.  East of the store was a residence for the owners, a storage shed, 3 cement block cabins, 2 frame cottages, containing 2 bedrooms each, and a lake-shore cottage.  In addition to the owner's residence there were 8 units for rent.  The units were furnished and equipped for general housekeeping.

In early 1954, appellants listed the resort for sale with a real-estate agency.  In the latter part of March, 1954, plaintiffs-appellees, having read the advertisement and visited the premises, agreed on a purchase price and paid $50 to bind the transaction.  From that time on appellees had possession of the premises at their pleasure.

In June, 1954, a land contract was drawn and executed.  Under this contract plaintiffs-appellees were to pay $16,500 for the resort, $5,000 down, the remainder to be paid at the rate of $100 the first of each month, beginning with the 1st of July, 1954.

Plaintiffs opened for business on June 18, 1954.  Prior to July 1, 1954, they went to defendant Mr. Sweeney and demanded their money back, claiming insufficient water and lack of business, as well as other misrepresentations of the premises.

On July 19, 1954, plaintiffs filed their bill of complaint, alleging some 7 counts of fraud and misrepresentation, none of which referred to any sewage problem.

On November 16, 1954, plaintiffs filed an amendment to their bill of complaint, alleging, in addition to the other allegations of fraud, appellants' failure to inform plaintiffs of the fact that they had had difficulty with the neighbors over disposal of sewage, culminating in an injunction being issued to restrain defendants-appellants from depositing the effluent from their septic tank on their neighbor's property. Plaintiffs also claim that the defendants failed to inform them that for several years the State health department had been attempting to compel defendants to make changes in their sewage setup based on State health department recommendations. Plaintiffs contend that this failure to disclose material facts to plaintiffs constituted fraud for which they are entitled to receive their money back.

The trial court, in a written opinion, found as a matter of fact that there existed no fraud by the appellants as to the original several allegations of fraud. He, however, found that the failure of appellants to disclose the problem with the Michigan health department, and the difficulty and lawsuit with the neighbors to the south, was the withholding of a material fact, constituting fraud, and entitling the plaintiffs to rescind their contract and recover their money.

Defendants made a motion for new trial. The circuit judge, in a written opinion, granted a partial new trial, and plaintiffs were given the opportunity to clear up to the satisfaction of the court the question of when they began to rescind their contract, whether it was before July 4, 1954, when they first learned of the sewer problem, and whether plaintiffs had waived the right to rescind on the sewage proposal by not alleging it in their original bill of complaint.

Testimony was taken on these points, and, at the conclusion of the partial new trial, on May 24, 1957,

the circuit judge, in a written opinion, once again found the appellants had committed a fraud as to the sewage matter. Decree for rescission and return of plaintiffs' money was entered.

Defendants appeal to this Court, claiming that since the circuit court eliminated issues of fraud as charged in the original bill of complaint, the record does not disclose that appellants defrauded plaintiffs on the drainage issues.

Mrs. Lillian M. Ball testified:

"*Q.* Where did that pipe run?
"*A.* It runs in an open ditch between our property and the property to the north.
"*Q.* You mean when you tripped that sump pump it would go out in the open air?
"*A.* Yes.
"*Q.* Did it smell?
"*A.* Yes, when you go down the lane you can smell it and if its really hot you can smell it."

Mr. Raymond R. Ball testified:

"*Q.* Is there any field there for seepage bed?
"*A.* Not to my knowledge. The end of the drain is in an open drainage."

Mr. Glenn Alfred Ball, a 30-year-old son who lived on the premises and assisted in the operation of the business, testified:

"*Q.* And the pipe to hook it on to, did they hook the sump pump to this pipe? Did that shoot the septic tank juice out on the other property?
"*A.* There was a straight pipe into the ditch and then you pumped it across on to the land.
"*Q.* Was there any seepage bed or field there to pump it onto?
"*A.* No, none. "

Mr. Albert DePew, a witness for the plaintiffs, testified that he had rented cabins for several years from the Sweeneys and was present over the 4th of

July week end in 1954. On direct examination he was asked the following questions and he made the following answers:

"*Q.* While you were up there previous to 1953 did you ever know of Mr. Sweeney having difficulty with his getting rid of sewage?

"*A.* No, and I didn't pay much attention to it.

"*Q.* Did you pay any attention to it since that time?

"*A.* In 1954 I was up there and remember a pipe that went through there supposed to go across the road and didn't go across, it was broke off and was was broke off, in 1953 it was broke.

"*Q.* You mean a pipe went across the road?

"*A.* Yes.

"*Q.* From where?

"*A.* From a sump to pull off the septic tank, and it was showing right on the ground until we repaired the pipe.

"*Q.* When did you do that?

"*A.* About the last of July sometime.

"*Q.* What year?

"*A.* 1954.

"*Q.* And you fixed the pipe and found it?

"*A.* Yes.

"*Q.* Where did it go?

"*A.* Into the ditch.

"*Q.* On the north side?

"*A.* Yes.

"*Q.* Before that time it was just going out on the ground?

"*A.* Yes, on the ground right behind one of the cottages.

"*Q.* Did it make a smell?

"*A.* It did.

"*Q.* Did it continue to smell after you pumped it over on the north side?

"*A.* No, not so bad.

"*Q.* Do you know of anyone complaining about the cottages not having facilities, any of the customers?

"*A.* When they had trouble with the water they would have to give them their money back because there was no water.

"*Q.* When did they do that?

"*A.* Along the first part of July.

"*Q.* Of 1954?

"*A.* Yes"

Mr. L. Comer Sweeney testified on direct examination in response to a question asked by Mr. Atkins, his attorney:

"*Q.* And what did you do about this pump that pumps this sewage to the north?

"*A.* I bought a new sump pump that would set up on the platform and I ran a pipe across our lot and into our ditch where it would run down into the field tile that were already there."

Again, he subsequently testified:

"*Q.* You pumped it through the pipe from this tank over on the north side on to the surface?

"*A.* Yes."

On the rehearing Mr. Sweeney testified that the complaint was first made to him by Mrs. Ball after the 4th of July week end. Mrs. Ball testified: "Well it was after the 4th of July. I wouldn't be positive of the date but it was after the 4th, after we had the trouble that week end." A series of letters were also introduced as exhibits representing correspondence by the Michigan health department and Mr. Sweeney over a several year period covering the subject matter of depositing effluent from the septic tank on top of the ground surface.

Mr. LaRue L. Miller of the Michigan health department testified:

"*Q.* Now, from 1948 until your last inspection that you had of this place has Mr. Sweeney ever complied with the requirements of your health department?

"*A.* No, as far as I know because in this file 1954 and the last inspection there on this inspection it says 'sewage running on top of the ground, by front cottage sump pump empties into open ditch.' That's dated 8–12–54.

"*Q.* State whether or not that creates a health problem there?

"*A.* Yes, anytime sewage is on the ground surface we feel that creates a potential health hazard.

"*Q.* And where this property is being used for resort purposes is it more urgent that that situation be corrected?

"*A.* We feel that resorts are visited by many different people during the year and that constitutes a public place and its more to our concern to see that conditions are corrected and made as safe as possible from a health standpoint."

We cannot say, on examination of the entire record, that, had we been in the position of the trial judge, we would have found otherwise than he did with respect to the concealment of the sewage difficulties between defendants and the neighbors to the south and the Michigan department of health. The trial judge heard the witnesses, observed their demeanor, and was in the best position to determine their credibility and to conclude what the facts in the case really were. Although this Court on appeal hears chancery cases *de novo,* it ordinarily will not reverse the lower court where there is evidence and testimony to support the finding of the lower court unless justice demands it, or it can be said that the evidence clearly preponderates the other way, the trial judge being in a better position to test the credibility of the witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity. *Grace Harbor Lumber Co.* v. *Ortman,* 190 Mich 429, 438; *Van Allen* v. *Sprague,* 206 Mich 116, 120; *Higbie* v. *Chase,* 306 Mich 577; *Dodge* v. *Blood,* 307 Mich 169; *Bennett*

v. *Bennett,* 336 Mich 133; *Kren* v. *Rubin,* 338 Mich
288; *Kirby Terminal Co.* v. *City of Detroit,* 339 Mich
155; *Dudley* v. *Rapanos,* 353 Mich 237. Nothing in
the record of this case persuades us that the trial
court erred.

The decree of the trial court is affirmed. Appellees
may tax costs.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK,
EDWARDS, and VOELKER, JJ., concurred.