*In re* HARTMAN ESTATE

BRISBIN v MICHIGAN CONFERENCE ASSOCIATION OF
SEVENTH DAY ADVENTISTS

OPINION OF THE COURT

1. TRUSTS—TRUSTEE—BENEFICIARY—LIABILITY.

A trustee is liable to the beneficiary for any improper act or
withholding of an act by the trustee.

2. EQUITY—APPEAL AND ERROR—DE NOVO REVIEW.

The Court of Appeals will hear and consider chancery cases *de
novo* on the record on appeal; however, it is inclined to give
considerable weight to the findings of the trial judge in equity
cases primarily because the trial judge is in a better position to
test the credibility of the witnesses by observing them in court
and hearing them testify than is an appellate court which has
no such opportunity; therefore, it will not ordinarily disturb the
findings of the trial judge's determination of the facts in an
equity case where, after an examination of the entire record, it
reaches the conclusion that it would not have arrived at a
different result had it been in the position of the trial judge.

DISSENT BY CHURCHILL, J.

3. TRUSTS—TRUSTEE—CORPORATIONS—STATUTES.

*Trustee corporations are prohibited from having any personal
interest in or title to any part or portion of trust property
except as specifically otherwise provided by statute (MCLA
450.148).*

REFERENCES FOR POINTS IN HEADNOTES
[1] 54 Am Jur, Trusts § 300 *et seq.*
[2] 5 Am Jur 2d, Appeal and Error § 822.
  Advantage which the original trier of facts enjoyed over reviewing
    court from opportunity of seeing and hearing witnesses. 111 ALR
    742.
[3] 54 Am Jur, Trusts § 118.
[4] 66 Am Jur 2d, Religious Societies § 37.
[5, 6] 54 Am Jur, Trusts §§ 229, 314, 315, 406, 413.

4. TRUSTS—CHURCH CORPORATIONS—STATUTES.

> *Trustees of church trustee corporations may hold property trans-*
> *ferred to them for the use and benefit of the parent religious*
> *denomination, and in the management thereof shall be gov-*
> *erned by the terms of the instrument by which such property*
> *shall be given to them (MCLA 450.161).*

5. TRUSTS—TRUSTEE—DUTY—BENEFICIARY—SELF-INTEREST.

> *Every trustee owes a duty to the beneficiary of loyalty, good faith*
> *and restraint from use of its position to promote self-interest.*

6. TRUSTS—TRUSTEE—DUTY—SELF-INTEREST.

> *Where a trustee places itself in a position where self-interest*
> *conflicts with duty, its acts will be scanned with closer scrutiny*
> *than if made in the usual course of business.*

Appeal from Osceola, Charles A. Wickens, J. Submitted Division 3 April 4, 1973, at Grand Rapids. (Docket No. 14388.) Decided January 15, 1974. Leave to appeal denied, 392 Mich 752.

Complaint by Shirley Brisbin, administratrix of the estate of Caroline V. Hartman, against the Michigan Conference Association of Seventh Day Adventists seeking to set aside a deed or requiring the defendant to reconvey a farm. Judgment for defendant. Plaintiff appeals. Affirmed.

*Herrinton, Herrinton & Hughes* (by *Theodore E. Hughes),* for plaintiff.

*Fraser, Trebilcock, Davis & Foster* (by *Donald A. Hines),* for defendant.

Before: HOLBROOK, P. J., and T. M. BURNS and CHURCHILL,* JJ.

HOLBROOK, P. J. This writer agrees generally with the facts as stated by Judge CHURCHILL in his well-written opinion, but is constrained to respectfully disagree with the result reached because the

---

* Circuit judge, sitting on the Court of Appeals by assignment.

facts as this writer views them call for an affirm-
ance.

The basis for my brother's reversal appears to
rest upon his interpretation of the negotiations
and communications concerning the possible sale
of the trustor's farm during late 1970 and early
1971.

The facts concerning these matters are best
gathered from the testimony of the various wit-
nesses and the letter from Mr. Homer W. Trecar-
tin to Mr. and Mrs. Edward Simmonds who were
interested in purchasing the trustors' farm.

Mr. Trecartin testified in part as follows:

*"Q. (Mr. Hughes, plaintiff's attorney):* Mr. Trecartin,
at any time, did Mrs. Hartman tell you that she wanted
to sell the farm?

*"A.* No, she told me, she asked me what I thought
about selling the farm at this time. She said, we have
an offer. What do you think about selling the farm
now? And I think, well, I won't tell you what I think.
But, she didn't tell me, I want to sell the farm. She
said, what do you think? Shall we sell the farm? It was
not her intention in any way, if I have understood her
to withdraw, merely to exchange the real property for
money in the trust. And—

*"Q.* That's what you understand?

*"A.* That's the way I understood what she said, and
then the money would be, she would be drawing money
from her own account and not advances on the trust.

*"Q.* What do you base that understanding on?

*"A.* On our discussion.

*"Q.* What did she say to you then?

*"A.* She said, do you think that we ought to sell? If I
recall—

*"Q.* She, at that point was placing her confidence in
you and asking for your judgment?

*"A.* If we ought to sell now, yes.

*"Q.* And at that point you discouraged her from
selling?

"*A.* I discouraged her from selling at that point. Later, later— * * *

"*Q.* When Mrs. Hartman talked to you about selling the farm, did you tell her that she should try to get more money for the farm?

"*A.* No, sir.

"*Q.* And at that time, did you think that the $25,000 proposal by Mr. and Mrs. Simmonds was a fair price?

"*A.* I didn't know.

"*Q.* Did you propose to Mrs. Hartman that you do anything to find out?

"*A.* Yes.

"*Q.* What did you propose?

"*A.* That we get some appraisal and talk to the bank and talk to the some of the realtors in the neighborhood that know the value of property and find out if we're getting a fair price.

"*Q.* Do you recall Mrs. Hartman calling you in the early part of 1971, at your office in Lansing?

"*A.* Yes.

"*Q.* Do you recall her asking you to come to see her?

"*A.* Yes, I do.

"*Q.* Do you recall her stating that she would like to talk to you about selling the farm?

"*A.* I don't recall what she wanted to talk to me about on the phone, but I came up to see her.

"*Q.* And did she say that she wanted to see you right away?

"*A.* As soon as possible.

"*Q.* And when did you ultimately arrive following that telephone conversation? When did you see her?

"*A.* I don't have a record of the exact date, but it was very soon after.

"*Q.* And when Mrs. Hartman proposed selling the farm to you, did you tell her that we ought to hold off until spring?

"*A.* I told her that we ought to know more before we take the first offer that's made. We ought to investigate the value of the farm and know that we're getting a fair price and I thought maybe towards spring would be a better time to put it on the market.

*"Q.* And you were very concerned about the amount of money that would be gotten for the sale of this farm, were you not?

*"A.* No, I wasn't. I thought, I didn't want her to be, to sell the farm for less than the value, but I wasn't trying to get a lot more money than that. I thought we ought to have a fair price. As trustee, as representative of the trustee, I felt it my duty to sell the farm when we did sell it for the fair market value if possible.

*"Q.* And as representative of the trustee, you felt this was your obligation?

*"A.* I did. And Mrs. Hartman, too. We had no evidence at that time that Mrs. Hartman wouldn't use all the money in the trust."

Elder Robert W. Boggess, who was a local pastor of the Hartmans's church at Marion, Michigan, during the time when the trust arrangement was made testified in part as follows:

*"Q. (Mr. Hines, defense attorney):* While Elder Trecartin was talking with them, did they make mention of their family? Specifically their grandson and their granddaughter?

*"A.* I don't know whether they mentioned that right during the time we were discussing this trust agreement or not, right there at that time. I don't recall.

*"Q.* Well, at any time on that day, do you recall their mentioning other members of the family?

*"A.* They mentioned other members of the family. Either on that day or on the next, the next date when Mr. Trecartin came back. I wouldn't be sure just which day, maybe both days.

*"Q.* Well, recognizing that you're not sure whether they mentioned the family on the late November date or the December 9th, date, what was said about the family?

*"A.* Mrs. Hartman made mention of the fact that they were not in need of any of the materials or properties that they had.

*"Q.* Now, when you said they, the they is the grandson and granddaughter?

"*A.* The grand, that's right. The grandchildren.

"*Q.* Were you aware of the fact that they had a granddaughter and a grandson?

"*A.* Yes, sir.

"*Q.* You were aware of that before this meeting, were you?

"*A.* I believe that it was before the meeting. I believe, but here again, I wouldn't just guarantee that it was before this meeting. My acquaintance with them had been over a period of better than a year and I'm sure that in conversation with them I had learned of their family."

The letter from Mr. Trecartin to Mr. and Mrs. Simmonds reads as follows:

"November 16, 1970

"Mr. and Mrs. Edward Simmonds
"Box 222
"Genesee, Michigan
"Dear Mr. and Mrs. Simmonds:

"A few weeks ago I visited Caroline Hartman, Marion, and she advised me that you had visited her regarding the purchase of the farm, and had made her an offer.

"This came just as I was leaving for California for a month and I fully intended to write you while there but failed to accomplish it.

"We have not considered selling the property as long as she wishes to live there, but it is becoming more difficult as months go on for her and it may soon be advisable to move ahead on this.

"Now, you are not the first to request the privilege of purchasing, so it would seem best to keep this in mind and when it is decided to move ahead, advise each party and the one who is willing to make the best offer, could purchase.

"As soon as we have a definite decision we will advise you. Thanking you for your interest and looking forward to making your acquaintance, I am

"Sincerely,
"H. W. Trecartin"

Mr. Edward Simmonds, who with his wife was interested in purchasing the farm stated that he had visited with Mrs. Hartman at four different times, the fourth and last visit being the one pertaining to the issue herein involved. He testified in part as follows:

"*Q. (Mr. Hughes):* About what time of day did you visit Mrs. Hartman?

"*A.* I would have to say that it was probably about midday.

"*Q.* And would you describe that visit with Mrs. Hartman?

"*A.* Mrs. Hartman was ill at the time and she was in bed. She had a lady taking care of her. I do not recall the name. But, anyhow, we went in and visited her at the time.

"*Q.* And what took place on this visit with Mrs. Hartman?

"*A.* I had this letter with me and I asked about it and she was quite surprised. She didn't seem to know anything about it.

"*Q.* Are you referring to the letter dated November 16, 1970, from Mr. Trecartin?

"*A.* Yes, sir.

"*Q.* And you did show the letter to her?

"*A.* I showed the letter to her.

"*Q.* And specifically, what was her response, if you recall?

"*A.* Like I say, she was quite surprised. She didn't seem to understand why this had been sent to me like this.

"*Q.* What did she say to you?

"*A.* She said that as far as she knew that the place was for sale, that she could do anything that she wanted to do with the farm as long as she was alive.

"*Q.* Did you read the letter to her or did she read it herself?

"*A.* I read the letter to her.

"*Q.* During the course of reading the letter, did she

make any specific remarks about the truth or non-truth of the letter?

"*A.* She said that in portions of it, I did not read fast but in portions. She said this is not the truth. I believe that probably this was the time that the farm wasn't for sale, that we have decided not to sell it. I don't recall the gist of the letter, but I think this was it, when she, I recall her saying this is not the truth when I was reading that letter. * * *

"*Q.* Mr. Simmonds, did you state that Mrs. Hartman indicated that she wanted to contact her attorney for purpose of closing this sale?

"*A.* On the third visit, she was to contact her attorney so that we could get together for the close of the sale. Now, at the time, it was whether or not I could swing the deal, so to speak, financially on the terms that would be arranged, but this was the intent of getting together with the attorney."

Mrs. Arlene Simmonds, wife of Edward Simmonds, testified in part as follows:

"*Q. (Mr. Hughes):* When did you next see Mrs. Hartman, if you did?

"*A.* In the winter. Sometime after the first of the year. It would have been late January or early February.

"*Q.* 1971?

"*A.* 1971.

"*Q.* What occurred on that visit?

"*A.* Again, Mrs. Hartman was in bed. She said that she was just getting over pneumonia. She was very weak and we had taken the letter with us and she asked us to read the letter to her. And he read the letter to her at that time.

"*Q.* Is that the November 16, 1970, letter from Mr. Trecartin?

"*A.* Yes.

"*Q.* To your husband?

"*A.* Yes. That's right.

"*Q.* Following, or rather did your husband read the letter in its entirety?

"*A.* Yes.

"*Q.* Did he indicate from whom the letter was?

"*A.* Yes.

"*Q.* And what was Mrs. Hartman's response during or following the reading of that letter?

"*A.* It was during the reading of it. When he said that, oh, we had not considered selling the property as long as she wishes to live there. And then she said, that's not true.

"*Q.* What else did she say?

"*A.* Well, she said that she was willing to sell it yet. She was still willing. We had, you know, figured that she had decided against it when we got the letter, but she indicated that she was still willing to sell it. She said, I'm very weak now. I couldn't do anything about it now, but maybe I'll feel stronger in the spring and we can take care of things at that time.

"*Q.* Did she say anything more about her attorney?

"*A.* Not that I recall.

"*Q.* At that point did she indicate to you whether or not anybody had any strings on the farm?

"*A.* No. No, she said that the farm was hers to do with as she wished as long as she remained alive. After her death, it would go to the church."

Mr. Howard Fosnaught, the funeral director for both Mr. and Mrs. Hartman, testified that he was called to their home a short time before Mr. Hartman passed away to make the funeral arrangements, and testified in part as follows:

"*Q. (Mr. Hughes):* They both are talking to you at this point?

"*A.* That's right. They assured me that when the time came, when they passed away, that all I needed to do was to send my bill to the Michigan Conference of Seventh Day Adventists and the bill would be taken care of because they had decided and made out their papers to convey their property to this organization."

After Mr. Hartman passed away Mr. Fosnaught

took care of his funeral service and billed the Michigan Conference of Seventh Day Adventists, who paid the bill. About six months to a year before Mrs. Hartman passed away Mr. Fosnaught was again called to the Hartman home. Concerning this occasion Mr. Fosnaught testified in part as follows:

"*Q. (Mr. Hughes):* All right. Now, did there ever come a time after Mr. Hartman's funeral when Mrs. Hartman alone talked to you about funeral arrangements?

"*A.* Yes, she called me and asked me to come out and I did. I called on her and she wanted to go over her arrangements, pall bearers and everything, and again assured me where I should send my bill in case and when anything happened to her.

"*Q.* When you say, assured you, how did she assure you?

"*A.* She told me that the arrangements was made the same as with Mr. Hartman. When she passed away my bill was to go to the Conference."

The bill for Mrs. Hartman's funeral was likewise submitted to the Michigan Conference of Seventh Day Adventists and paid by them.

The trial judge determined *inter alia* the following:

"At no time during her lifetime did Caroline Hartman ever make any statements or comments, from the proofs, that she decided to change her mind and have her grandchildren take her estate, and not her church. In fact, the proofs are to the contrary. The funeral director who buried both Mrs. and Mr. Hartman testified that at various times he talked to Mr. and Mrs. Hartman and that at all times up and to shortly before the death of Mrs. Hartman they confirmed with him that the church would pay their funeral expenses in accord with the trust agreement and the deed. In fact, the church did pay the funeral expenses of both Mr. and Mrs. Hartman, in accord with the trust agreement

and the deed, and the court is convinced, from these proofs, that the Hartmans never intended to benefit their grandchildren at the expense of the church, but, in fact, desired the trust agreement to continue as it was and that their church was to take their property under the facts and circumstances that came about in this case."

It appears to this writer from the evidence produced at the trial that the chancellor hearing the matter correctly determined the issues involved in the case. There was never a firm understanding for the sale of the farm by Mrs. Hartman to the Simmonds, in fact, the Simmonds had never proceeded to the point where the terms of the sale were agreed upon. The discussions between Mr. and Mrs. Simmonds and Mrs. Hartman were preliminary in nature and were subject to an arrangement for the payment of the $25,000 satisfactory to Mrs. Hartman. She in turn desired the advice of Mr. Trecartin on this important subject. When they discussed the matter late in 1970 Mr. Trecartin advised Mrs. Hartman that there had been at least one other inquiry by a possible purchaser of the property, and that he thought it would be wise to have the property appraised and then submitted to possible purchasers in order to obtain a fair price for the farm, if it were to be sold. The trustee at no time did anything to stop Mrs. Hartman from selling the farm. At no time did Mrs. Hartman indicate her displeasure with the arrangement that she had made, nor did she indicate a desire to leave the property to her grandchildren. In fact, at the very beginning of the transaction Mr. and Mrs. Hartman indicated that the grandchildren did not need the property and further that they desired to do something for their church. The trustee did not owe any duty to sell the property in question to Mr. and Mrs. Sim-

monds or to any other possible purchaser. Mrs.
Hartman was well aware of the fact that she could
revoke the trust agreement, but she chose not to
do so. She did advise the Simmonds that she would
wait until spring and at that time take care of the
matter. The cases cited by my brother judge in his
opinion, *Waddell v Waddell,* 335 Mich 498; 56
NW2d 257 (1953); *Sloan v Silberstein,* 2 Mich App
660; 141 NW2d 332 (1966); and *In re Culhane's
Estate,* 269 Mich 68; 256 NW 807 (1934), are
authorities for the rule that a trustee is liable to
the beneficiary for any improper act or withhold-
ing of an act by the trustee. In this case we do not
have any violation of a duty by the trustee, to the
beneficiary, the church. We do not have any viola-
tion of a duty by the trustee to the trustor unless
we assume that the trustor Mrs. Hartman desired
to revoke the trust but was prevented from so
doing by the trustee. This writer does not believe
the facts justify such an interpretation. Our Su-
preme Court set forth our duty in regard to re-
viewing equity cases *de novo* in the case of *Biske v
City of Troy,* 381 Mich 611, 613–614; 166 NW2d
453, 455 (1969):

" 'We hear and consider chancery cases *de novo* on
the record on appeal. *Johnson v Johnson,* 363 Mich 354;
109 NW2d 813 (1961); *Osten-Sacken v Steiner,* 356 Mich
468; 97 NW2d 37 (1959); *Futernick v Cutler,* 356 Mich
33; 95 NW2d 838 (1959); *A & C Engineering Co v
Atherholt,* 355 Mich 677; 95 NW2d 871 (1959); *Straith v
Straith,* 355 Mich 267; 93 NW2d 893 (1959); *Ball v
Sweeney,* 354 Mich 616; 93 NW2d 298 (1958). This
Court, however, is inclined to give considerable weight
to the findings of the trial judge in equity cases. This is
primarily because the trial judge is in a better position
to test the credibility of the witnesses by observing
them in court and hearing them testify than is an
appellate court which has no such opportunity. We do
not ordinarily disturb the findings of the trial judge in

an equity case unless, after an examination of the entire record, we reach the conclusion we would have arrived at a different result had we been in the position of the trial judge.'" *Christine Building Co v City of Troy,* 367 Mich 508, 517–518; 116 NW2d 816, 820 (1962).

In considering this equity cause *de novo* according to the above rule this writer defers to the trial judge's determination of the facts and agrees with his decision to deny the plaintiff relief.

Affirmed, with costs to the defendant.

T. M. Burns, J., concurred.

Churchill, J. *(dissenting).* On December 9, 1964, Henry Hartman and Caroline V. Hartman, husband and wife, conveyed a 160-acre farm in Osceola County by warranty deed to the Michigan Conference Association of Seventh-Day Adventists, the defendant herein. On the same day a "property trust agreement" between the Hartmans as trustors and the defendant as trustee was executed. Henry Hartman died May 28, 1965. Caroline V. Hartman died March 2, 1971. This is an action by the administrator of her estate seeking to set aside the deed or requiring the defendant to reconvey the farm. Caroline V. Hartman died intestate and her heirs, who would benefit if the estate recovers the property, are two adult grandchildren.

The plaintiff complains that (1) the deed and agreement are voidable because of circumstances surrounding their executing including undue influence, (2) the legal arrangement between the trustors and the trustee was intrinsically bad, and (3) even if the deed and trust agreement were valid in the first place, the defendant ought to be required to reconvey the property because of the manner in

which it conducted itself in the administration of the trust.

At the conclusion of a nonjury trial the trial court filed a written opinion with findings of fact, dismissing the action. The plaintiff is entitled to a *de novo* determination of all issues by this Court on appeal.

On December 9, 1964, Henry Hartman was 87 years old and was in very poor physical health. He signed the deed and agreement with an "X". Caroline V. Hartman was 77. She suffered from the normal infirmities of her age but her health and ability to function were much better than that of her husband. Neither of them were mentally incompetent. They lived on the farm and were dependent on social security benefits and annual pasture rent of $600. They had a good relationship with each of their grandchildren who had lived with them for a few years during their childhood following the death of their mother.

The Hartmans were faithful members of the Seventh-Day Adventist Church in Marion, Michigan. The pastor of the church made regular pastoral and sick calls on the Hartmans. During one such call in November 1964 one of the Hartmans told him that they were interested in making some plan for disposal of their property, remembering the church, and sought his counsel with respect thereto.

The defendant is a church trustee corporation organized pursuant to MCLA 450.159; MSA 21.160. It was the legal entity for the Michigan Conference of Seventh-Day Adventists. Both organizations, the association and the conference, shared a common president, a common treasurer, several common directors and a common office in Lansing. Elder Homer W. Trecartin was a salaried em-

ployee of both organizations. He was secretary of the corporation and the director of its department of trust services. For all purposes and issues in this suit, his acts were the acts of the corporation.

In response to the Hartmans' statement of interest in making a property disposition the pastor arranged for Elder Trecartin to visit the Hartmans at their home on December 1, 1964, with him. After prayers Elder Trecartin asked the Hartmans what was in their heart. They informed him that they would like to turn over part or all of their property to the church and asked him how this might be done. He explained several ways that it could be done with emphasis on the advantages of a revocable trust. It is probable, although not certain, that he delivered to the Hartmans a church brochure encouraging gifts to the church and containing some information about how such gifts can be made. The Hartmans informed Elder Trecartin that they would go by the revocable trust method. Elder Trecartin left a sample trust agreement with the Hartmans, informing them that they were welcome to show it to an attorney if they wished.

On December 9, 1964, the local pastor, Elder Trecartin and another association officer, who was a notary public, went to the Hartman home. Elder Trecartin read the agreement to the Hartmans, whereupon the deed and agreement were executed. Henry Hartman signed with an "X". In response to questions by the Hartmans Elder Trecartin made some statements about their rights under the trust which standing alone were inaccurate but which, considering the conversation in its entirety, were not misleading.

The deed was absolute in form, containing no reference to the trust, and no reservation of rights.

The trust agreement refers to the deed and provides that the trustors shall have all possessory and income rights during their lifetime and requires the trustors to pay the costs of ownership such as taxes, insurance and maintenance. It provided that the right of revocation was personal to the trustors and that in the event that the trustors were unable to make said request because of illness, incapacity or incompetency, then the trustee would supplement the trustors' funds to enable them to maintain their customary standard of living, and to accomplish such purpose the trustee had authority to rent or sell the land. It further provided that upon the death of the surviving trustor the trustee would pay the expenses of last illness and burial of the surviving trustor, in excess of the trustors' personal estate, and that the residue of the trust estate would then be transferred to the conference to be used for its religious, educational and charitable work. The agreement protected the trustee against paying out funds in excess of the trust estate.

Although the trust agreement was somewhat ambiguous with respect to the right of withdrawal of the surviving trustor, a fair construction of the instrument would be that the surviving trustor would be entitled to exercise and enforce all of the rights of the trustors, and further that the right of withdrawal was absolute, at least until the trustee became obligated by terms of the trust to make financial advances.

Henry Hartman died a few months after execution of the deed and trust agreement. The trustee paid his funeral expense and medical expenses. Beginning soon after his death and continuing until her death on March 2, 1971, the defendant made advances for taxes, insurance and her sup-

port, and following her death the trustee paid her funeral expenses. The total advances made by the trustee were $8,963.49. Upon her death Caroline Hartman had personal estate of approximately $3,000 and it is undisputed that at no time was the trustee required to make any payments by terms of the trust. She voluntarily accepted the benefit of advances made by the trustee and we infer that she believed that her right of withdrawal was contingent on repayment of advances.

In the spring of 1970 Edward Simmonds and his wife, Arlene, who were strangers to Caroline Hartman, visited and inquired if it was possible to purchase the farm. She informed them that she would sell it for $25,000 reserving a life estate. The Simmonds were interested in buying it but had to work out financing. They came back a few weeks later and found her home alone and ill in bed. After obtaining help for her, they left without discussing business. In late summer or early fall the Simmonds returned to discuss terms of purchase. She then told them that she would have to contact Elder Trecartin, whom she referred to as her attorney, and that the Simmonds would be contacted.

Sometime in the summer of 1970 a party, unidentified in the testimony, contacted Elder Trecartin about purchasing the land. Trecartin informed this prospective purchaser that the farm was not for sale because Caroline Hartman had only a life estate.

On October 15, 1970, Elder Trecartin visited Caroline Hartman. She informed him that she was interested in accepting the Simmonds offer of $25,-000 with a reservation of a life estate. He discouraged her from making this sale, and, for the first time, informed her that others were interested in buying the farm.

On November 16, 1970, Elder Trecartin wrote to the Simmonds informing them that "We have not considered selling the property as long as she wishes to live there", and informing them that eventually they and other prospective purchasers would be contacted.

In January 1971 the Simmonds again went to the farm to see Caroline Hartman, at which time the letter of November 16, 1970, was read to her. She acted surprised, and with reference to the portion of the letter that the farm was not for sale she said this was not the truth. Caroline Hartman then, referring to the church, said, "I think they have got plans for this property", and she told the Simmonds "when the weather breaks, we will get this straightened out". She died a few weeks later.

The plaintiff claims that a fiduciary relationship existed between Elder Trecartin and the Hartmans at the time of execution of the deed and trust agreement, and that a presumption arises that the deed and trust agreement were obtained by undue influence. *In re Wood Estate,* 374 Mich 278; 132 NW2d 35 (1965). The trial court found that a fiduciary relationship did not exist at the time of execution of the instruments but that even if it did, the resulting presumption of undue influence was overcome by the evidence. We agree with this latter conclusion and make no finding with respect to the existence of a fiduciary relationship. We find that the Hartmans understood the nature of the legal relationships created. The deed and agreement were validly procured.

Fairly construed the Hartmans had the beneficial right of ownership or the right of support, and the arrangement did accomplish their original purpose of transferring a substantial portion of the survivors' estate to their church. We therefore

reject the plaintiff's claim that the arrangement
was unconscionable and therefore void.

The plaintiff claims that the trust agreement is
in violation of MCLA 450.148; MSA 21.149, which
prohibits trustee corporations from having any
personal interest in or title to any part or portion
of the trust property. This section provides that
"trustee corporations shall be governed by the
provisions of this act *except as specifically other-
wise provided"*. (Emphasis supplied.) MCLA
450.161; MSA 21.162 specifically provides that the
trustees of trustee church corporations may hold
property transferred to them for the use and
benefit of the parent religious denomination, and
in the management thereof shall be governed by
the terms of the instrument by which such prop-
erty shall be given to them. The trust created by
the Hartmans was within the scope of this statute.

I would affirm the trial court's judgment but for
the negotiations and communications concerning
the possible sale of the farm in 1970 and 1971. The
trial court rejected such negotiations and commu-
nications as a basis for relief because she did not
ask to terminate the trust and because she did not
state a desire to have her grandchildren take her
estate instead of the church. These fact findings,
with which I have no disagreement, do not answer
the questions of whether the trustee breached its
duty in the administration of the trust.

Every trustee owes a duty to the beneficiary of
loyalty, good faith and restraint from use of its
position to promote self interest. *Waddell v Wad-
dell,* 335 Mich 498; 56 NW2d 257 (1953); *Sloan v
Silberstein,* 2 Mich App 660; 141 NW2d 332 (1966);
*In re Culhane's Estate,* 269 Mich 68 (1934); 54 Am
Jur, Trusts, §§ 311–315.

These principles have special significance where,

as here, the trustee itself is in a position to acquire the entire trust estate by restraining or discouraging the trustor's absolute right of revocation.

" 'Where a trustee places itself in a position where self-interest conflicts with duty, its acts will be scanned with closer scrutiny than if made in the usual course of business.' *Culhane, supra.*" *Waddell v Waddell, supra,* p 509.

The trustee gave misleading information to a prospective buyer about the nature and extent of Caroline Hartman's interest in the land. The trustee withheld from her the fact of the inquiry. The trustee wrote a misleading letter to her own prospective buyer.

It is my inescapable conclusion of fact that the trustee did these things to minimize the risk that she would exercise her right to terminate the trust.

In these ways, the trustee breached its duty to Mrs. Hartman. She discovered the breach herself and resolved to do something about it. Because of her age, the weather and her frail state of health she was deprived of the reasonable opportunity to take corrective action by her own death.

The only possible equitable remedy for a breach of trust is to make sure that her estate is not diminished thereby and that the trustee's alter ego, the parent denomination, is not enriched thereby. The fact that she did not express a desire for her heirs to receive her estate is irrelevant when, as here, she died intestate.

Accordingly the defendant should be required to reconvey the real estate to the plaintiff.

The defendant should have a lien therein to secure reimbursement of $8,963.49 advanced with

interest from the date of each advance to the date of final repayment.

The judgment of the trial court should be reversed and the action should be remanded to the trial court for further proceedings consistent herewith.