*In re* GREEN CHARITABLE TRUST

Docket Nos. 99571, 99576. Submitted April 13, 1988, at Lansing. Decided October 17, 1988. Leave to appeal applied for.

> The Attorney General of Michigan, St. Peter's Home for Boys, the Bishop of the Episcopal Church-Diocese of Michigan, the Dean of the Cathedral Church of St. Paul and the Cathedral Church of St. Paul, beneficiaries of a charitable trust created by Leslie and Edith Green, petitioned the Oakland County Probate Court to remove Miles Jaffe and Comerica Bank—Detroit as trustees of the charitable trust and to surcharge those trustees for their failure to secure the best possible price for the sale of a particular piece of land which formed a substantial portion of the trust assets. Petitioners also sought to have the bank removed as personal representative of the estate of Edith C. Green, deceased. Petitioners alleged that respondents had breached their fiduciary duty by failing to secure the best possible price for the sale of the property and by failing to fully disclose the fact that Jaffe, an attorney, had previously represented the purchaser of the property. The probate court, George E. Benko, J., after hearing the testimony, removed Jaffe and the bank as trustees of the charitable trust, removed the bank as executor of the estate, and surcharged both respondents jointly in the amount of $1,900,000, finding that both trustees had failed to make adequate efforts to determine the property's value or market the property before the sale and that both had been remiss in the handling of Jaffe's conflict of interest. Respondents filed separate appeals.
>
> The Court of Appeals *held:*

REFERENCES

Am Jur 2d, Executors and Administrators §§ 186 *et seq.*

Am Jur 2d, Property § 13.

Am Jur 2d, Trusts §§ 304 *et seq.,* 325 *et seq.,* 341, 433 *et seq.,* 452 *et seq.,* 58, 477.

Standard of care required of trustee representing itself to have expert knowledge or skill. 91 ALR3d 904.

Measure of trustee's liability for breach of trust in selling investment property, or changing investments, in good faith. 58 ALR2d 674.

Implied power of executor or testamentary trustee to sell real estate. 23 ALR2d 1000.

1. The Court of Appeals reviews a probate court's findings of fact under the clearly erroneous standard. No added level of scrutiny is to be employed merely because the probate court adopted in its findings language from the petitioner's posttrial brief.

2. The record fails to support the contention that the probate court failed to recognize the petitioners' burden of proof.

3. The trust instrument limited the trustees' liability to instances of bad faith. Bad faith connotes an arbitrary, reckless, indifferent or intentional disregard of the interests of the person owed a duty.

4. Respondents, as trustees, owed to the beneficiaries with respect to the sale of the real property owned by the trust the duty to seek the highest price obtainable. Precedent to obtaining the highest price is the duty to establish the value of the property by a sound independent appraisal of the property or by testing the market by actively seeking offers under circumstances which would encourage fair, legitimate and seasonable competition.

5. The record supports the probate court's finding that respondents not only failed to obtain a reasonable evaluation of the property's value but further failed to make adequate efforts to bring the fact of the property's availability to the attention of a wide spectrum of potential purchasers.

6. Since there had not been an adequate appraisal made of the property prior to its sale, the probate court properly relied on the appraisals made subsequent to the filing of petitioners' petitions. Further, the probate court did not err in finding that the appraisal based upon the property's development potential was the more compelling of the appraisals.

7. The probate court did not clearly err in finding that Jaffe had a conflict of interest and that such conflict of interest resulted in a breach of Jaffe's fiduciary duties.

8. While the probate court properly considered the provisions of the Code of Professional Responsibility for the purpose of determining the standard to which Jaffe, as an attorney, should be held with respect to discharging his duties as a trustee, it was error and beyond the power of the probate court to make a determination that Jaffe violated the Disciplinary Rules.

9. The bank had the duty, under these circumstances, to monitor Jaffe's actions, since Jaffe was acting as the bank's agent in the negotiations.

10. The bank, as a personal representative of the estate, owed a fiduciary duty to the beneficiaries of the estate and was liable

for any loss resulting from any negligence in handling the estate or for any misfeasance, malfeasance or other breach of duty.

11. The probate court did not abuse its discretion in limiting the scope of rebuttal testimony.

12. The question of whether the bank should be jointly and severally liable with Jaffe was not properly raised below and thus may not be raised on appeal.

13. The probate court did not abuse its discretion in removing respondents from their fiduciary positions.

Affirmed with the exception of the finding that respondent Jaffe was in violation of the provisions of the Code of Professional Responsibility.

1. TRUSTS — PROBATE COURTS — FINDINGS OF FACT — APPEAL.

The standard for appellate review of probate court findings of fact in proceedings relating to the administration of trusts is the clearly erroneous standard; findings of fact are clearly erroneous when the Court of Appeals is left with the definite conviction that a mistake has been made; that standard is not changed by the fact that the probate court, in making its findings, adopts the language proposed by one of the parties.

2. TRUSTS — TRUSTEES — STANDARD OF CARE — FIDUCIARY DUTIES.

The standard of care expected of a trustee is that of a prudent man dealing with the property of another; if the trustee has special skills or is named as a trustee on the basis of representations of special skills or expertise, he is under a duty to use those skills; to be prudent includes acting with care, diligence, integrity, fidelity and sound business judgment; trustees also have imposed upon them the fiduciary duties of honesty, loyalty, restraint from self-interest and good faith (MCL 700.813; MSA 27.5813).

3. TRUSTS — TRUSTEES — LIABILITY OF TRUSTEE.

The liability of a trustee may be limited by the terms of the trust instrument; however, such a trust provision does not preclude judicial review or the application of the required standard of care but rather limits the personal liability of the trustee under the stated circumstances.

4. TRUSTS — TRUSTEES — REAL PROPERTY — SALE OF REAL PROPERTY.

A trustee who is undertaking the sale of real property owned by the trust has an obligation to seek the highest price obtainable; the fact that the price obtained was higher than the appraised value does not necessarily establish that the trustee discharged the obligation to obtain the highest price for the property.

5. TRUSTS — TRUSTEES — REAL PROPERTY — SALE OF REAL PROPERTY.

A trustee who undertakes to sell real property owned by the trust, especially where the real property represents the single most valuable asset of the trust, has the responsibility of informing all of the beneficiaries of the impending sale of the property (MCL 700.814; MSA 27.5814).

6. TRUSTS — TRUSTEES — REAL PROPERTY — SALE OF REAL PROPERTY — FAIR MARKET PRICE.

A trustee, before selling real property of the trust, must first establish the value of the property being offered for sale; factors to be considered in determining whether a trustee undertook adequate efforts to determine the value of the property include whether the trustee secured an independent appraisal of the property by competent experts and whether the trustee tested the market place by actively seeking competitive offers from a wide spectrum of potential purchasers.

7. DAMAGES — PROOF OF DAMAGES — REAL PROPERTY — APPRAISALS.

The law, with respect to the proof necessary to establish damages on a tort claim, does not require a greater degree of certainty than the nature of the case permits; accordingly, where the claim is based on alleged losses arising out of the sale of real property, damages may properly be based upon an appraisal of the property in question if such appraisal establishes with a reasonable degree of certainty the value of the property.

8. COURTS — PROBATE COURTS — TRUSTS — ATTORNEYS — CODE OF PROFESSIONAL RESPONSIBILITY.

A probate court in a proceeding in which it is alleged that a trustee who is an attorney breached his fiduciary duty may consider the Code of Professional Responsibility for the purpose of determining the standard to which the trustee should be held; however, the probate court does not have the authority to hold that such attorney-trustee, in fact, violated the Disciplinary Rules.

9. EXECUTORS AND ADMINISTRATORS — PERSONAL REPRESENTATIVES — BREACH OF FIDUCIARY DUTY.

A personal representative of a deceased's estate stands in a position of confidence and trust with respect to the beneficiaries; as a fiduciary, a personal representative is liable for any loss resulting from its negligence in handling the estate and for any misfeasance, malfeasance or other breach of duty (MCL 700.501, 700.544; MSA 27.5501, 27.5544).

*Frank J. Kelley,* Attorney General, *Louis J.*

*Caruso,* Solicitor General, and *Luis F. Fernandez,* and *Nelson, Wilson & Wilson, P.C.* (by *C. Thomas Wilson* and *Christopher T. Wilson*), and *Bodman, Longley & Dahling* (by *Theodore Souris, Charles N. Raimi* and *Kathleen O'Callaghan*), for petitioners.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Richard C. Van Dusen, Victor J. Baum, Robert P. Hurlbert, Robert W. Powell* and *William T. Burgess*), for Miles Jaffe.

*Warner, Norcross & Judd* (by *Harold S. Sawyer* and *Joseph G. Scoville*), for Comerica Bank—Detroit.

Before: BEASLEY, P.J., and HOOD and R. L. TAHVONEN,* JJ.

HOOD, J. Respondents, Comerica Bank and Miles Jaffe, appeal as of right from an order of visiting Oakland County Probate Judge George E. Benko which removed respondents as trustees of the Leslie H. Green and Edith C. Green Charitable Trust, removed Comerica as personal representative of the estate of Edith C. Green, deceased, and surcharged respondents in the amount of $1,900,000. The petitioners are the Michigan Attorney General, St. Peter's Home for Boys, Bishop of the Episcopal Church—Diocese of Michigan, Dean of the Cathedral Church of St. Paul, and the Cathedral Church of St. Paul. This case is based on the petitioners' objections to respondents' sale of real property owned by the estate and charitable trust to Maurice Cohen, a client of respondent Jaffe.

Leslie and Edith Green owned and maintained a residence on 315 acres in Bloomfield Township, Oakland County, known as Turtle Lake Farms.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

In 1969, Leslie and Edith Green created a charitable trust funded in part by a grant of an interest in Turtle Lake Farms. As finally amended, the beneficiaries of this trust are St. Peter's Home for Boys, the Cathedral Church of St. Paul and the Cathedral of the Episcopal Church, Diocese of Michigan. The named trustees were the Greens, Comerica and Miles Jaffe.

Mr. Green died in 1973. His will gave Mrs. Green a life estate in the portion of Turtle Lake Farms including their residence and created a marital trust for the benefit of his wife during her lifetime. The charitable trust was made the residuary beneficiary of the marital trust and would receive the marital trust's interest in Turtle Lake Farms upon Mrs. Green's death. Comerica was named sole trustee of the marital trust.

Mrs. Green died in March, 1983. Her will made specific bequests totaling $320,000 and directed the establishment of a million dollar trust fund for her granddaughter. The residue of her estate was left to the charitable trust. Mrs. Green's estate consisted of cash and securities valued at $1,340,000, plus her interest in Turtle Lake Farms. Comerica was designated personal representative of the estate.

Upon Mrs. Green's death, Bishop McGehee and Dean Herlong of the Episcopal Church became co-trustees of the charitable trust as provided for under the trust. Under the trust, only Comerica and Jaffe were empowered to make decisions regarding the disposition of the real property.

According to respondents, soon after Mrs. Green's death they determined that the liquid assets of the estate were insufficient to satisfy the cash bequests, the funding of the $1,000,000 trust fund for the granddaughter, the estate taxes and the administrative expenses. After reviewing the

options, Comerica and Jaffe concluded that the interests of the estate and its beneficiaries would best be served by the sale of the Turtle Lake property.

At Mrs. Green's death, three entities owned undivided interests in Turtle Lake: the Edith Green estate, the marital trust, and the charitable trust. For the sale, Comerica acted in three capacities: as executor of the estate, as sole trustee of the marital trust, and as one of the trustees of the charitable trust. Jaffe also acted in several capacities. He was a trustee of the charitable trust. Also, Jaffe and his firm, Honigman, Miller, Schwartz & Cohn, were attorneys for the estate, for Comerica as executor, for Comerica as trustee of the marital trust, and for Comerica as trustee of the charitable trust. The record also contains testimony of Dean Herlong to the effect that Jaffe, at least on one occasion, provided legal advice to him in his role as trustee. Jaffe had been a personal friend of the Greens, as well as their attorney. He drafted their wills and the trust instruments.

During the time between Leslie Green's death and the death of his wife, Comerica's trust department received inquiries from individuals interested in purchasing Turtle Lake Farms. Since the intent was for Mrs. Green to live out her life on the property, Comerica informed inquiring developers that the property was not on the market and that they would be notified when it became available. The parties' briefs describe in detail the events following Mrs. Green's death and leading up to the sale of the Homestead, the real property concerned in this action. The Homestead is the western portion of the Turtle Lake property, consisting of 211 acres and including the Green's mansion and other buildings, Turtle Lake, and lakefront property on Upper Long Lake.

On September 15, 1983, Comerica accepted an offer from Maurice Cohen for the Homestead. The sale was closed on November 1, 1983, by execution of a land contract for $3,250,000, with $1,500,000 down payment and the balance over two years at twelve percent interest. Maurice Cohen is a successful real estate developer and was represented by the Honigman firm.

This case concerns the objections by the charitable trust beneficiaries to Jaffe's and his law firm's conflicts of interest in representing both buyer and seller, to Comerica's management of the sale of the property, and to the adequacy of the price received for the Homestead.

At this point, it may be helpful to identify the remaining individuals involved.

Testifying for Comerica were Gari Kersten and Cleveland Thurber. Kersten was vice president of Comerica's trust real estate department which supervised the management of trust real estate and the Comerica representative who apparently worked most closely with Jaffe on the sale of property. Thurber was in charge of Comerica's trust department, which generally oversaw the trust, and one of the trust officers who participated in decisions to sell the property to and accept the Cohen offer. Another Comerica employee, the sales manager, Mr. Keating, apparently supplied information to Kersten on the value of the property. David Wind was another trust officer involved in various decisions. Neither of these two men testified.

Leo Majzels, who had done an appraisal of the property in 1973, was retained by Comerica following Mrs. Green's death as part of the efforts to prepare a marketing plan and as a consultant to assist in evaluating the value of the property.

Calvin Hall was retained to submit a development plan on the possible uses of the land. Donald Tilton was retained to study possible environmental problems caused by the wetlands on the property.

Also testifying was Paul C. Robertson, a local land developer and builder, who had expressed interest in developing the property prior to Mrs. Green's death and who contacted Comerica regarding the property again in May, 1983.

The Attorney General is a petitioner as a necessary party in interest to estate proceedings involving charitable trusts. MCL 14.254(c); MSA 26.1200(4)(c).

While specific facts will be raised where relevant, an overview of the factual basis for this case may also be helpful at this point.

Maurice Cohen visited the Homestead in April, 1983, and expressed an interest in purchasing the Green residence and a few surrounding acres. Kersten told Cohen that the sale of such a small parcel was not desirable because it would reduce the marketability of the balance of the property. Jaffe put Cohen in touch with Calvin Hall and showed Cohen Hall's development plan to encourage Cohen's interest in a larger parcel. Throughout the summer, Jaffe continued to meet with Cohen to encourage him to make a suitable offer for the entire parcel.

According to Jaffe, when he realized in August that Cohen was interested in making "a hard offer" on the entire Homestead, he informed Thurber that there was a potential conflict of interest because his law firm represented Cohen. In a letter of August 12 to Thurber, Jaffe requested the consent of Comerica, Bishop McGehee and Dean Herlong, as trustees, to the Honigman firm's dual representation and indicated that, in any event,

Jaffe would not act as co-trustee with respect to any offer by Cohen. It does not appear that Jaffe sent copies of the letter directly to Bishop McGehee or Dean Herlong.

On August 18, at a meeting of Comerica representatives and Honigman attorneys, Majzels expressed his opinion that the Homestead should sell for between $3 and $3.5 million.

On August 22, all of the trustees of the charitable trust met to discuss the possible sale of the land and the question of dual representation. Dean Herlong testified that Thurber informed them of the estate's cash needs and Jaffe discussed the various problems with development of the property. Jaffe, Thurber and Kersten also informed Bishop McGehee and Dean Herlong that they expected Cohen to make an offer for the western portion of the property. Jaffe explained the conflict of interest.

Former Chief Justice G. MENNEN WILLIAMS was also present at this meeting in his capacity as Senior Warden of the Vestry of the Cathedral Church of St. Paul but he did not testify at trial. Dean Herlong testified that the Chief Justice was present at the Dean's request. The Senior Warden is the representative of the cathedral to whom Dean Herlong is ultimately responsible, and Dean Herlong felt it was in the best interest of the cathedral for the Chief Justice to be present. The Chief Justice, pursuant to MCL 600.207; MSA 27A.207, was precluded from practicing law, and we find no indication in the record that he was present as or in any way acted as a legal advisor. The record also does not indicate that the fact of the Chief Justice's position in the judicial system had any bearing on the proceedings.

On August 23, Cohen made an offer for the Homestead of $3 million. Neither the price nor the

conditions were acceptable to Jaffe or Comerica, and Kersten directed Jaffe to go back to Cohen and see what could be done to better the offer.

On August 26, a one-page circular describing generally the land and its availability was sent to people who had expressed an interest in the property and to local real estate people. Kersten authorized the mailing against the advice of Jaffe.

On August 31, 1983, Bishop McGehee and Dean Herlong sent a letter to Jaffe consenting to the dual representation "subject to the satisfactory demonstration by the Comerica Bank after reasonable investigation that the offer is indeed suitable, appropriate, and in keeping with the present market situation."

On September 6, Kersten met with Robertson. Kersten apparently attempted to secure an offer on the entire parcel from Robertson, indicating that the asking price was $10 million, with $4 million down. Kersten met with Cohen on September 12, apparently in an attempt to secure a better offer and to obtain an extension of Cohen's offer, both of which Cohen refused. A revised offer at $3.25 million was prepared by the Honigman attorneys and accepted on September 15.

On September 19, Dean Herlong was informed of the sale. On September 26, Wind, Kersten, and Jaffe met with Dean Herlong, Bishop McGehee and Chief Justice WILLIAMS. Dean Herlong testified that he expressed at this meeting his concerns regarding the sale and Comerica's marketing of the property. The Cohen deal was closed on November 1, 1983. Bishop McGehee and Dean Herlong signed the land contract as trustees of the charitable trust. Dean Herlong testified that Jaffe told them that the sale was a "fait accompli" and that their signatures were a legal formality.

On December 29, Jaffe wrote to Bishop McGehee

and Dean Herlong advising them that another Honigman client was interested in another part of the property and requesting their consent to the multiple representation. In a letter dated March 5, 1984, Dean Herlong consented to the multiple representation, but asked for a written appraisal of the property before sale. According to Jaffe, Dean Herlong indicated for the first time that he was dissatisfied with the way in which the Cohen sale had been handled. Dean Herlong testified that he had orally conveyed his dissatisfaction earlier.

After the present controversy arose, appraisals of the market value of the Homestead as of September 15, 1983, were prepared by Majzels, who was selected by Jaffe, and by Proctor, who was selected by Dean Herlong from a list of appraisers submitted by Jaffe. Over Dean Herlong's objection, the instructions to the appraisers included information on the Cohen sale. The appraisals were completed in 1985, with Majzels indicating a value of $3.35 million and Proctor arriving at a value of $5.15 million for the Homestead.

On September 9, 1984, Comerica filed its first account on the estate of Edith Green. On October 29, 1985, St. Peter's Home for Boys filed a petition and objection to the account. On December 2, 1985, the Attorney General filed a similar petition. On November 12, 1986, Bishop McGehee and Dean Herlong filed petitions in the probate court pursuant to MCL 700.805; MSA 27.5805, to surcharge Comerica and Jaffe as trustees of the charitable trust, and the Attorney General filed a petition to surcharge and remove Comerica as executor of the Edith Green estate, as trustee of the marital trust, and as trustee of the charitable trust.

On November 13, 1986, Judge Benko began hearings on all of these petitions, excluding issues related to the marital trust because Comerica had

been discharged as trustee when the Leslie Green estate had been closed in 1984. Following several days of testimony, the probate court issued its thirty-four page opinion, finding that Jaffe and Comerica violated their obligations as trustees to the settlors and beneficiaries of the charitable trust and that Comerica violated its obligation as personal representative to the Edith Green estate. As to Comerica, the court found that it had negligently handled the sale of the property, as evidenced by its inadequate efforts to determine the property's value and its failure to adequately market the property. Furthermore, the court found that Comerica was negligent in its response to Jaffe's acknowledged conflict of interest and in allowing Jaffe and his firm to control the negotiations. As to Jaffe, the court found that his conflict of interest, although acknowledged, tainted the sale because there was not full disclosure of the extent of his prior representation of Cohen on personal tax matters, because Jaffe actively participated in the negotiations and because his course of conduct insured that his client, Cohen, obtained the property at an inadequate price. The court found that both parties had failed in their duty to keep the beneficiaries reasonably informed and to fulfill a self-imposed duty to keep their co-trustees fully advised of developments.

We begin our review with two procedural issues raised by Comerica and Jaffe.

The probate court has exclusive jurisdiction over proceedings concerning the internal affairs of all trusts, including charitable trusts, in such matters as the removal of a trustee or the review of accounts. MCL 700.805; MSA 27.5805; MCL 700.21; MSA 27.5021; MSA 700.11(2); MSA 27.5011(2); *Kowalesky v Kowalesky,* 148 Mich App 151, 159-160;

384 NW2d 112 (1986); *In re Americana Foundation,* 145 Mich App 735; 378 NW2d 586 (1985).

This Court does not review a probate court's findings of fact de novo, MCL 600.866(1); MSA 27A.866(1); MCR 5.802(B)(1), but will review the record to determine whether the findings must be reversed because they are clearly erroneous. *In re Sykes Estate,* 131 Mich App 49, 53; 345 NW2d 642 (1983). Findings are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976). Comerica argues that the standard should be the one employed in some federal cases of "intense scrutiny," because the probate court adopted language from petitioners' posttrial brief for use in its opinion. See, e.g., *Andre v Bendix,* 774 F2d 786 (CA 7, 1985). We decline to adopt this standard. The findings are those of the trial court and will be reversed only if clearly erroneous and not simply because of the particular language used. See *Anderson v Bessemer City,* 470 US 564, 572; 105 S Ct 1504; 84 L Ed 2d 518 (1985).

Next, Jaffe cites the language of one subsection of one of the court's nineteen findings as evidence that the probate court failed to recognize the petitioners' burden of proof. Finding 17(a) reads:

> Comerica and Jaffe had the burden of proving the fairness and adequacy of the price paid by Jaffe's client.

This case began as a challenge to the accounts of the Edith Green estate. As noted by Jaffe, the general rule regarding the burden of proof is that the administrator has the burden of establishing the correctness of his account and the propriety of his charges. *In re LaFreniere's Estate,* 316 Mich

285, 292; 25 NW2d 252 (1946). This burden has also been described as the trustee having "to show the absence of an irregularity or of any personal benefit" to the trustee. *Roberts v Michigan Trust Co,* 273 Mich 91, 120; 262 NW 744 (1935).

Respondents' burden of going forward was recognized by counsel for Jaffe and his law firm, as indicated in the transcript of the pretrial conference and by the role they assumed at trial. Neither respondent has provided us with an example where the court placed a burden on either respondent that was inconsistent with the proceedings or which resulted in some injustice to respondents or prejudice to their ability to pursue their case. We find no error.

We now turn to the substantive issue of whether Jaffe and Comerica violated their duties to the trust. As a preliminary matter, we note that, while Jaffe maintains that he declined to act as a trustee with respect to any offer by Cohen, he did not resign his position as trustee. Therefore, his duties to the beneficiaries and the trust as to matters related to the valuation and marketing of the property did not end when he chose to decline to act on the offer.

In general, the duties imposed on the trustee are determined by consideration of the trust, the relevant probate statutes and the relevant case law. See, e.g., *In re Butterfield Estate,* 418 Mich 241; 341 NW2d 453 (1983). A claimed breach of duty and any resulting liability is tested by the facts of each case. *Newton v Old-Merchants National Bank & Trust Co,* 299 Mich 499, 515; 300 NW 859 (1941).

The standard of care expected of a trustee is that of "a prudent man dealing with the property of another, and if the trustee has special skills or is named trustee on the basis of representations of special skills or expertise, he is under a duty to

use those skills." MCL 700.813; MSA 27.5813. To be prudent includes acting with care, diligence, integrity, fidelity and sound business judgment. *In re Buhl's Estate,* 211 Mich 124, 127, 132; 178 NW 651 (1920). In addition, the courts have imposed on the fiduciary duties of honesty, loyalty, restraint from self-interest and good faith. *Hertz v Miklowski,* 326 Mich 697, 700; 40 NW2d 452 (1950); *Kelsey v Detroit Trust Co,* 265 Mich 358, 362; 251 NW 555 (1933).

Paragraph VII of the trust gives the trustees broad powers "to do everything they in good faith deem advisable even though it would not be authorized or appropriate for fiduciaries (but for this power) under any statutory or other rule of law . . . ." Paragraph V empowers Comerica and Jaffe "in their sole discretion" to determine the timing of any sale of the real property so as to realize its "full value."

Giving trustees discretionary or broad powers does not mean that there are no limits to those powers. Trustees' actions will be reviewed for abuse of that discretion. *Moss v Axford,* 246 Mich 288, 294; 224 NW 425 (1929); *In re Sykes Estate, supra,* 131 Mich App 54. The trustee is bound to exercise his discretion honestly and in good faith. *Moss, supra,* 246 Mich 294.

The duty imposed is something more than that expected in everyday business dealings. "A trustee is held to something stricter than the morals of the market place." *In re Butterfield Estate, supra,* 418 Mich 256, quoting *Meinhard v Salmon,* 249 NY 458, 464; 164 NE 545 (1928), adopted in Michigan in the case of *In re Culhane Estate,* 269 Mich 68, 76; 256 NW 807 (1934).

As noted by the parties, the liability of the trustee may be limited by the terms of the trust instrument. *Newton, supra,* 299 Mich 508-510.

Comerica's and Jaffe's liability for error, negligence, mistake of judgment, act or omission as trustees of the charitable trust was limited to actions done in bad faith. This provision is consistent with the common law principle that trustees may not be liable for mere mistakes or errors of judgment where they have acted in good faith and within the limits of the law and of the trust. *MacKenzie v Union Guardian Trust Co,* 262 Mich 563, 588; 247 NW 914 (1933); *Gibney v Allen,* 156 Mich 301; 120 NW 811 (1909).

The exculpatory clause does not preclude judicial review or application of the required standard of care. In *Newton,* a trust provision permitted self-dealing by the trustee and also limited liability to any loss not occasioned by the trustee's gross negligence or bad faith. *Newton, supra,* 299 Mich 507. In reviewing whether the beneficiary could recover for alleged losses, the Court relied on the common law principles that transactions involving self-dealing should be closely scrutinized and looked to see whether the trustee's actions indicated any fraud, bad faith or overreaching on the part of the trustee. *Newton, supra,* 299 Mich 512.

An exculpatory clause generally is not considered to reduce or enlarge the standard of care required of the trustee in administering the trust, but acts to relieve the trustee of personal liability under the stated circumstances. Bogert, Trusts & Trustees (2d ed rev), § 542 (1988 Supp, p 25). It will not generally be construed to mean that the trustee is not accountable to anyone for his actions. A trust implies an equitable duty to act for the benefit of the beneficiary and an all-inclusive exculpatory clause would connote either that there was no enforceable duty owed the beneficiary or that there was no remedy for a breach of duty

even if the breach was found to be unconscionable. *Id.*

The "bad faith" standard used in the Green trust has not been defined in the trust context in Michigan. However, the principle has been applied in trust situations in evaluating a trustee's diligence, honesty, and good faith. *In re Baldwin's Estate,* 311 Mich 288, 310; 18 NW2d 827 (1945); *In re Tolfree Estate,* 347 Mich 272, 290; 79 NW2d 629 (1956). In the insurance context, bad faith has been defined as "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty." *Commercial Union Ins Co v Liberty Mutual Ins Co,* 426 Mich 127, 136; 393 NW2d 161 (1986).

Bad faith is not a specific act in itself, but defines the character or quality of a party's actions. Its presence, as with a determination that a trustee has violated his duty to the trust, depends on the facts of the individual case. See *Commercial Union, supra,* 426 Mich 137.

Comerica argues that the trial court erred in not defining "bad faith." We agree with the court in *Spiegel v Beacon Participations, Inc,* 297 Mass 398, 416; 8 NE2d 895 (1937), quoting *Penn Mutual Life Ins Co v Mechanics Savings Bank & Trust Co,* 73 F 653, 654 (CA 6, 1896), that bad faith "is an ordinary expression, the meaning of which is not doubtful." The record does not indicate that counsel felt the need to provide the court with guidance on a specific definition that should be applied. The probate court's opinion is consistent with the concerns expressed above.

Specific duties of trustees include keeping the beneficiaries "reasonably informed of the trust and its administration." MCL 700.814; MSA 27.5814. In the context of the sale of real property, there is an obligation to seek the highest price obtainable.

*Thiel v Cruikshank,* 96 Mich App 7, 12; 292 NW2d 150 (1980). The entire circumstances of the case will be considered in reviewing a contested sale. That the price realized at the sale was at or above the appraised value does not necessarily indicate that the best price was obtained. *Id.*

The duty to obtain the best price has been expanded upon in other jurisdictions to specifically include consideration of those factors noted by the probate court: the determination of fair market value, the proper marketing of the property, and the adequacy of the price obtained. The parties have referred us to a number of cases from other courts, one of which, *Allard v Pacific National Bank,* 99 Wash 2d 394; 663 P2d 104 (1983), is strikingly similar to our situation. In *Allard,* the Supreme Court of Washington affirmed a finding that the trustee had breached its fiduciary duties in its management of the sale of real property located in downtown Seattle, the sole asset of the trust. The beneficiaries argued a breach of duty based on the trustee's failure to inform them of the sale and failure to either obtain an independent appraisal or place the property on the open market prior to the sale.

The Washington court found that the trustee "must inform beneficiaries . . . of all material facts in connection with a nonroutine transaction which significantly affects the trust estate and the interest of the beneficiaries prior to the transaction taking place." *Allard, supra,* 99 Wash 2d 404-405. This duty is based on the generally recognized principle that the beneficiaries must know how the estate is being managed in order that they may hold the trustee to proper standards of care and honesty and obtain the benefits to which they are entitled. *Id.;* Bogert, *supra,* § 961, p 2. The trustee's duty to keep the beneficiaries informed has been

codified in Michigan in the Revised Probate Code, MCL 700.814; MSA 27.5814. In *Allard,* there was one offer made for the property by a leaseholder who had a right of first refusal. The court found that, at a minimum, the beneficiaries had a right to know of the offer prior to the sale to give them the opportunity to outbid the leaseholder.

We agree with the *Allard* court that this duty, especially in the instant case where the single most valuable asset was the real property, imposed on Jaffe and Comerica the responsibility of informing all the beneficiaries of the impending sale. It is not clear in what capacity, as co-trustees or as representatives of the beneficiaries, Dean Herlong and Bishop McGehee were first contacted. However, it is clear that Jaffe and Comerica had made a specific commitment to keep Dean Herlong and Bishop McGehee informed, and that commitment should also have been kept. The probate court did not err in finding that Jaffe and Comerica breached this duty.

We now turn to whether the trustees fulfilled their duties in the sale of the property. *Allard's* second issue requiring an appraisal or testing the market has been considered in other jurisdictions as part of the trustee's duty to establish the value of the property offered for sale. Knowledge of value is the basic assurance that any sale price is fair and just. *Knight v Nottingham Farms, Inc,* 207 Md 65, 76; 113 A2d 382 (1955).

Factors which have been considered in determining whether adequate efforts were taken to determine value include the existence of a "sound" appraisal and consultation with competent local real estate people to obtain their expert advice. *Webb & Knapp, Inc v Hanover Bank,* 214 Md 230, 244-245; 133 A2d 450 (1957). In general, the question is whether the trustee has done its homework.

*Hatcher v United States National Bank of Oregon,*
56 Or App 643, 651-653; 643 P2d 359 (1982).

In the absence of a thorough appraisal, the
trustee may establish value by "testing the mar-
ket." "Testing the market" is not limited to consid-
eration of offers volunteered by actual potential
buyers. *Id.* It includes whatever actions may be
available to encourage fair, legitimate and season-
able competition. *Rippey v Denver United States
National Bank,* 273 F Supp 718, 740 (D Colo, 1967).

In *Allard,* the leaseholder made an initial offer
of $139,000. The trustees demanded at least $200,-
000, and the leaseholder eventually met that price.
The trustees' price was apparently based on an
internal appraisal by the trustee bank's trust de-
partment. However, the court found that, by fail-
ing to obtain an independent outside appraisal or
testing the market to determine what a willing
buyer would pay, the trustees had breached their
fiduciary duty.

In our case, respondents argue that they had
two appraisals to guide then, Majzels' and Ker-
sten's. But Jaffe, Kersten and Majzels testified that
Majzels was not engaged as an appraiser, but as a
consultant supplying his input on an appropriate
asking price. Jaffe specifically testified that they
did not want an appraisal "early on" for fear that
it would establish a ceiling on the price that could
deleteriously affect the manner of selling the prop-
erty. That Kersten and Comerica's real estate
department had an opinion regarding the value is
relevant but not determinative. No evidence was
presented by Keating as to the basis for his input,
nor is there any indication that Kersten's opinion
is equal to a sound and thorough independent
appraisal. The last full appraisal on the property
was done in 1973. The passage of time, as well as
the duty of the trustees, indictated that obtaining

a sound and thorough appraisal would have been prudent.

Nor do the facts indicate that the trustees, in the alternative, had "tested the market." Jaffe's reference to not wanting the appraisal "early on" highlights the weakness in crediting the contacts with local developers in early 1983 as part of "testing the market." Jaffe testified that these contacts were not for the purpose of soliciting offers, which might have helped establish value. There is no indication that these contacts were part of an organized effort to "test the market" in a manner which would reasonably take the place of a sound and thorough appraisal. The record does not indicate that the trial court clearly erred in finding that the trustees did not fulfill their duty of establishing the value of the property.

The probate court's next concern was the inadequate marketing of the property. Marketing means taking action to bring the property's "availability to the attention of a wide spectrum of potential purchasers." *Lockwood v OFB Corp,* 305 A2d 636, 639 (Del Ch, 1973). There is no one set method of marketing, rather the cases indicate that all the circumstances surrounding the sale are considered to determine adequacy. We agree with the Chancery Court of Delaware, that what we are looking for is "a reasonably aggressive program which men of prudence and intelligence would have followed." *Id.* Factors which have been considered include advertisement in appropriate publications, contact with local developers, listing with a local broker, use of "For Sale" signs, showing the property to prospective customers, consultation with local sources on whether the offer price was the best offer obtainable, canvassing for possible purchasers, wide circulation of brochures and taking advantage of events—such as free publicity—to

give notice of the sale. *Id.,* see also *Thiel, supra,* 96 Mich App 7; *Knight, supra,* 207 Md 77; *Webb, supra,* 214 Md 245. In short, we are looking to see if the trustees adopted and followed "a comprehensive and thorough plan to assure that the reasonable and intelligent steps necessary to secure the best possible market price were taken." *Lockwood, supra,* 305 A2d 640.

As noted above, the record indicates that, whatever early contacts with local developers occurred, they were not for the purpose of marketing the property. The indications from Jaffe and Kersten are that these early contacts, along with the information received from Hall and Tilton, were an attempt to formulate a plan for the orderly marketing of the property. According to Jaffe and Kersten, it was not until August that the trustees decided on the standard to be applied in selling the property. The distribution of the circular was their only marketing effort.

Even assuming that sending out a circular could be sufficient, this method of marketing is suspect in these circumstances. While the trustees were actively considering an offer on less than all of the property and for an initial cash payment of $1.5 million, the property was being marketed to the rest of the world in its entirety. At least one potential buyer was told that he needed an initial cash outlay of $4 million. Furthermore, the entire extent of the marketing effort encompassed approximately twenty days—the time between the mailing and the acceptance of the Cohen offer.

The testimony of Dean Herlong is that he was informed on August 22 that interested parties would be given thirty days to respond. However, the circular did not indicate a time limit or that time was of the essence. The record indicates that potential purchasers such as Robertson, who had

previously expressed an interest, were originally told it would be nine months to a year before offers would be accepted. Other purchasers could easily have accepted the circular as the first step in the long-awaited offering. The general impression we are left with is that the trustees were basically dormant, waiting for offers to be brought to them. Such lack of activity does not indicate that they fulfilled their duty to the trust. See, *Knight, supra,* 207 Md 77-78; *Allard, supra,* 99 Wash 2d 394.

The third area considered was the adequacy of the price obtained. While an accurate determination of value gives the trustees a good idea of where the bidding should begin, it does not mean that a higher price may not be available. See *Thiel, supra,* 99 Mich App 7. The entire range of activities and surrounding circumstances are examined to see if the trustees took steps to understand the value and qualities of the property, as well as the nature of the market, and then took appropriate steps to secure the maximum price available. See *Lockwood, supra,* 305 A2d 638; *Cosden v Mercantile-Safe Deposit & Trust Co,* 41 Md App 519, 531-536; 398 A2d 460 (1979); *In re Mills Will,* 26 A2d 241 (Del Ch, 1942). We note that where, as here, there is a claim of a trustee's conflicting or divided loyalties, that courts have placed a "stringent burden" on the trustee to show that the sale was fairly made for an adequate price. See *Cosden, supra,* 41 Md App 531.

A review of the record indicates that the trustees took a number of actions similar to those mentioned in the cases above. Prior to the Cohen offer, there were phone calls to local developers, there was consultation with an appraiser regarding value, other experts—Hall and Tilton—were consulted as to the use and potential problems,

and at least two prospective purchasers—Robertson and Johnson—were contacted. Following the offer, a flyer was widely circulated among those local entities apparently most likely to be interested. If this were a simple matter of checking off an appropriate number of boxes, it could be argued that the trustees fulfilled their duty. However, in viewing these actions as a whole, we cannot say that these actions amounted to any actual concerted effort to determine or obtain the highest price available. This is not to say that a written or established plan is required, but rather it is to say that individual actions which do not indicate a concerted effort towards understanding and achieving the maximum price are not enough.

In the absence of some contemporaneous evidence on the value of the property, the court was forced to consider the appraisals made in 1985 in determining what an adequate price might have been. Both Majzels and Proctor testified; both appraisals were available. Both respondents and petitioners were diligent in pointing out to the court the respective strengths and weaknesses of the appraisals.

We find that, as with any other means for the assessment of damages, an appraisal must establish with a reasonable degree of certainty what an adequate price would have been; however, the law does not require a higher degree of certainty than the nature of the case permits. See *Body Rustproofing, Inc v Michigan Bell Telephone Co,* 149 Mich App 385, 390; 385 NW2d 797 (1986). Given the facts of this case regarding the inadequacies of the trustees' actions with regard to the sale, it is not logical to require proof of a known purchaser or the existence of another offer to establish a price. The inadequate marketing in this case virtually precludes such a finding.

The court's finding that Proctor's appraisal, which included consideration of the development potential of the property, was more compelling as an indicator of price than Majzels' appraisal is not clearly erroneous. That the probate court found the development potential relevant to the worth of the property is not the same as Comerica's argument that the court was requiring the fiduciaries to speculate in risky land ventures.

The remaining issue concerning the trustees involves the court's finding that Jaffe was involved in a conflict of interest situation which tainted the sale and established his bad faith and self-dealing. We agree, as did the court in *Cosden, supra,* 41 Md App 519, that this is not a case of self-dealing because there was no evidence that Jaffe was actually a party or that he directly profited from the sale. We have been given no authority for the proposition that whatever indirect interest Jaffe may have had in his firm's fees amounts to self-dealing. However, as in *Cosden,* there is evidence of a potential conflict of interest or conflicting loyalties which must be considered.

In the instant case, it would appear that the trial court's reference to self-dealing was an attempt to find guidance both for the court and the fiduciary as to the expected course of conduct. We do not find the court's use of the term self-dealing to be sufficient grounds to reverse its finding, but will review the record to see if a conflict was established.

As a trustee, Jaffe was bound to consider the interests of the trust as paramount to all others. If other interests would prevent him from making a sound decision from the point of view of the trust, a potential conflict of interest exists. See *In re Derek Estate,* 145 Mich App 94, 98; 377 NW2d 351 (1985). It is a fundamental principle that the

trustee must display complete loyalty to the interests of the beneficiary, to the exclusion of all selfish interests or consideration of the interests of third parties. This principle is based on the understanding that a person acting in two capacities or in behalf of two interests may consciously or unconsciously favor one side over the other. It is not necessary that the trustee gain from the transaction to find disloyalty. Bogert, *supra,* § 543, p 204. "In its desire to guard the highly valuable fiduciary relationship against improper administration, equity deems it better to forbid disloyalty and strike down all disloyal acts, rather than to attempt to separate the harmless and the harmful by permitting the trustee to justify his representation of two interests." *Id.,* p 207.

As an attorney, Jaffe also had an obligation to use his skills and judgment in representing his client, thereby assuming a position of the highest trust and confidence. *Beattie v Firnschild,* 152 Mich App 785, 790; 394 NW2d 107 (1986). "A lawyer who is also a fiduciary bears a doubly high degree of responsibility and accountability." *State Bar Grievance Administrator v Estes,* 392 Mich 645, 653; 221 NW2d 322 (1974). While the Code of Professional Responsibility is not directly in issue in this case, it is relevant as expressing a standard of professional conduct expected of lawyers by which Jaffe may be measured. See *Beattie, supra,* 152 Mich App 791. At the very least, the Code puts the attorney on notice that he is to be sensitive to the potential problems accompanying the representation of multiple clients, Canon 5, and that it is his duty to avoid even the appearance of impropriety. Canon 9; *Melamed v ITT Continental Baking Co,* 592 F2d 290, 293 (CA 6, 1979).

The cases cited by Jaffe for his proposition that multiple representation may be valid are not de-

terminative, since in those cases the parties were fully informed of the nature of the conflict. See, e.g., *Melamed, supra,* 592 F2d 290. As noted by the probate court, Dean Herlong and Bishop McGehee, as co-trustees, were not fully informed of the extent of Jaffe's past representations of Cohen. Nor is it clear that they were kept apprised of the extent of his involvement in the Cohen negotiations and eventual sale. Similarly, the beneficiaries were not fully informed.

The fact is that Jaffe, as a named trustee, as the agent of Comerica and as an attorney with the law firm representing both the buyer and the seller, had a responsibility to avoid even the appearance of a conflict. The record indicates that the multiplicity of his roles created a situation fraught with conflict that could not be avoided by simply withdrawing as trustee for purposes of approving the Cohen offer. Jaffe's own testimony indicates the difficulty of the position in which he found himself: "It's very difficult in these kinds of situations, . . . to differentiate the head that you're using as trustee from the head that you're using as counsel. After all, you only have one. You have a lot of hats but you only have one head." The record indicates that, even after he committed not to act as a trustee, he was actively involved in the negotiations, and yet he testified that he had declined to act as both attorney for the estate and trustee for the charitable trust. The only party left to represent was Cohen, but Jaffe maintains that his firm's representation of the buyer was kept separate from him.

We know that Jaffe was involved in meetings regarding the adequacy of the offer and that he indicated approval of it to Comerica. As noted by the trial court:

> Even had the one page circular been designed to
> expose the property in its most favorable light to
> the market, there obviously was no time for any
> developer to investigate the property, perform soil
> borings, conduct environmental studies, prepare
> site plans, have the property appraised and study
> development costs, let alone prepare a bid. Cohen,
> on the other hand, had the benefit of the Calvin
> Hall site plans and Tilton materials and had spent
> five months studying the property before he had
> Honigman lawyers submit his bid.

At the very least, the short time span between the
mailing of the circular and the acceptance of the
Cohen offer gives the appearance that matters had
been manipulated to assure that no other offers
would be submitted or considered. Given our ear-
lier finding on the inadequacy of the sale efforts,
we cannot say that Jaffe's actions were the fair
and adequate dealings of the loyal fiduciary. The
court did not clearly err in finding a conflict or in
finding that the conflict resulted in a breach of
Jaffe's fiduciary duties.

However, while it was appropriate for the pro-
bate court to consider the Code of Professional
Responsibility as indicative of the standard to
which Jaffe should be held, we find that its holding
that he violated the Disciplinary Rules must be
vacated. The appropriate context for consideration
of this type of attorney misconduct appears to be
proceedings by the attorney discipline board, see
MCR 9.110, or an action brought by an aggrieved
client, see, e.g., *Beattie, supra,* 152 Mich App 785.
The probate court's holding on this issue was not a
necessary part of this adjudication and, to the
extent it may be considered a holding of the court,
we vacate it.

We further agree, given the facts of this case,
that it is clear that Comerica had a responsibility

to monitor or in some way react to Jaffe's conflict. Comerica's duty of loyalty applied to Jaffe and his firm as Comerica's employees or agents. Where a trustee allows its agents to pursue their own interests while carrying on trust work, the trustee may be liable to the same extent as the agent. Bogert, *supra,* § 543, p 216.

On the basis of all of the above, we affirm the trial court's holding that Jaffe and Comerica failed in their duties as trustees. Their actions and inactions were not mere negligence or errors in judgment. Their actions, clearly in violation of their duties and done with reckless or indifferent disregard of the beneficiaries' interests, indicate they acted in bad faith and preclude any insulation from liability under the trust's exculpatory clause.

As to Comerica's liability as personal representative, by statute the personal representative stands in a position of confidence and trust with respect to the beneficiaries. MCL 700.501; MSA 27.5501. Edith Green's will gave Comerica, as personal representative, the same broad powers it enjoyed as a trustee. But the similar limitation of liability, excluding negligence and mistake of judgment, was specifically made *not* applicable to a corporate fiduciary such as Comerica. As a fiduciary, Comerica is liable for loss resulting from its negligence in handling the estate and for any misfeasance, malfeasance, or other breach of duty. MCL 700.544; MSA 27.5544.

As a fiduciary, Comerica is held to the same standards regarding the sale of the property as were discussed above. Furthermore, the loyalty rule considered above with regard to Jaffe applies to all fiduciaries and their agents, not just trustees. Bogert, *supra,* § 543, p 216. The reasons discussed above also support the court's finding that

Comerica is liable for its failure to fulfill its duties as the personal representative.

Jaffe takes issue with the probate court's application of provisions of the Probate Code which do not deal specifically with the unsupervised administration of the trust. As an unsupervised trust, the charitable trust is primarily governed by Article 8 of the Code. MCL 700.801 *et seq.*; MSA 27.5801 *et seq.* While Article 8 primarily deals with procedural issues, it also provides that the duties of a trustee are not altered by this portion of the Code. MCL 700.812; MSA 27.5812. Nor does governance under this part of the Code preclude the probate court's application of or reference to other applicable provisions. See *In re Gerber Trust,* 117 Mich App 1; 323 NW2d 567 (1982).

The issue in this case was not whether specific provisions of the Probate Code were violated, but whether the fiduciary duty was violated. We find no error in the court's reference to various Code provisions as guidance on the standard expected of the trustees. For example, in a conflict situation as was involved here, it would be prudent for the trustee electing to proceed in any capacity to both fully inform the beneficiaries and seek court approval. MCL 700.642; MSA 27.5642.

Comerica argues that the court erred in excluding the testimony of the Bloomfield Township assessor relative to the fact that being in the Pontiac school district affected the value of the land. The assessor was offered as a rebuttal witness. He was not offered as an expert witness, but as a "dispassionate public official" whose testimony "has some significance." The probate court accepted the assessor's testimony on changes in the market and environmental considerations, but found that it had heard enough regarding the

school district issue. There was testimony on this issue from Majzels, Roberts, Kersten and Proctor.

The scope of rebuttal is within the sound discretion of the trial judge. Where the proffered testimony could have been introduced in the case in chief, refusing to accept the testimony is not an abuse of discretion. *Wolak v Walczak,* 125 Mich App 271, 279; 335 NW2d 908 (1983). Furthermore, Comerica failed to make an offer of proof and therefore did not preserve this issue for appeal. Without some indication of the substance of the testimony, it is not possible to tell if it was somehow so crucial to the case that its exclusion was error. *Id.,* p 278.

As to whether Dean Herlong and Bishop McGehee were estopped to complain, as noted in the cases cited by Jaffe, the general rule is that ratification occurs only where the beneficiary acted with full knowledge of all the facts and not under the influence of misrepresentation, concealment or other wrongful conduct of the trustee. *Newton, supra,* 299 Mich 509; *Lawrence v First Nat'l Bank & Trust Co,* 266 Mich 199; 253 NW 267 (1934). The record supports the probate court's finding that there is no estoppel because their qualified consent was not based on a full disclosure of the facts or the extent of the Jaffe-Cohen dealings. Nor were they fully informed when they signed the Cohen land contract.

On the issue of damages, Comerica argues that the probate court erred in surcharging it for the loss sustained by the marital trust which owned approximately twenty percent of the real property. Jaffe also argues an error in the surcharge because the court did not consider that his duty was only to the charitable trust. It is not clear that this issue was raised below and, therefore, not being preserved for review, we need not address it. *At-*

*torney General v Blue Cross & Blue Shield of Michigan,* 168 Mich App 372, 383; 424 NW2d 54 (1988).

In any event, in essence, the issue in this case was to what extent, if any, were the beneficiaries injured by Jaffe's and Comerica's activities. The probate court found Comerica, as personal representative and trustee, and Jaffe, as trustee, jointly and severally liable for their activities in the amount of $1,900,000. See Bogert, *supra,* § 862, p 35; 90 CJS, Trusts, § 258, p 296. There was no finding concerning the marital trust, nor did there need to be. Comerica's liability was based on an evaluation of its activities. That Comerica was not found liable for its role as trustee of the marital trust does not make its liability in its other roles any the less. The same is true for Jaffe. That Jaffe was not a trustee or personal representative of the estate is irrelevant to the liability imposed because of his own breach of duty as a trustee of the charitable trust. To carve out identities and liabilities at this stage of the proceedings smacks of the artificial and appears to be an effort to avoid liability rather than define the limits of liability.

Comerica further argues that the probate court erred in failing to credit Comerica for income received and expenses saved by the sale of the Homestead. The principle Comerica relies on has been applied in using gains to offset losses where the trustee has been involved in more than one transaction. See *In re Estate of Bartlett,* 680 P2d 369, 374-375 (Okla, 1984); Bogert, *supra* § 708, p 249; 3 Scott on Trusts (3d ed), §§ 213-213.2, pp 1711-1725. As in this case, where liability is based on selling property for less than its fair value, the general rule is that the loss to the trust is measured by the difference between the fair value and the amount received, or the amount the estate

would otherwise have received. *Thiel, supra,* 96 Mich App 14; Scott, *supra,* § 205, p 1667; Bogert, *supra,* § 747, p 506.

Finally, both Jaffe and Comerica ask that they be reinstated as co-trustees and personal representative. Removing a fiduciary is a question entrusted to the discretion of the probate court, and that court's decision will not be reversed absent an abuse of discretion. *In re Humphrey Estate,* 141 Mich App 412, 423; 367 NW2d 873 (1985). Given the facts of this case, we find no abuse of discretion.

With the exception of the finding regarding Jaffe's violation of the Code of Professional Responsibility, which is vacated, the probate court's order is affirmed.