**Adam J. MAIDA, Plaintiff,**

v.

**RETIREMENT AND HEALTH SERVICES CORPORATION, Defendant.**

**No. 91–CV–72950–DT.**

United States District Court, E.D. Michigan, S.D.

May 29, 1992.

David Hipp, Detroit, Mich., for plaintiff.

Robert Carson, Birmingham, Mich., Paul Erickson, Baltimore, Md., for defendant.

COHN, District Judge.

## I.

This is an action to quiet title. Plaintiff, Adam J. Maida, Roman Catholic Archbishop of the Archdiocese of Detroit (Maida or Seller) claims that Defendant, Retirement and Health Services Corporation (R & HSC or Purchaser) wrongfully filed an Affidavit of Interest and Notice of Claim against a 37 acre parcel of land owned by the Archdiocese. R & HSC counterclaims for specific performance of an agreement concerning the sale of the parcel or monetary damages. Now before the Court is Maida's motion for summary judgment and R & HSC's cross-motion for summary judgment. For the reasons stated below, Maida's motion will be granted and R & HSC's motion will be denied.

## II.

On June 8, 1990, Edmund Cardinal Szoka (Szoka), then Roman Catholic Archbishop of the Archdiocese of Detroit, executed an agreement with R & HSC (Agreement) for the sale of the 37 acre parcel occupied by St. John's Provincial Seminary in Plymouth, Michigan (Property). The Archdiocese would continue to own adjacent property. The relevant portions of the Agreement are as follows:

3. *Review of Property.* Upon execution of this Agreement Seller shall:

(a) During the term of this Agreement, provide Purchaser and its agents or consultants with access to the Property to inspect each and every part thereof to determine its present condition, and to make such engineering studies, tests and examinations of the Property as Purchaser may consider necessary, all at Purchaser's sole cost and expense; provided, however, that Purchaser shall repair any damage caused to the Property as a result of such tests and examinations conducted by Purchaser and restore it to its present state upon completion thereof. Purchaser agrees to indemnify and hold the Seller harmless for any claims, liability, damage, cost or expense (including reasonable legal fees) resulting from the Purchaser's access to the Property and such tests and examinations, excluding any obligation to correct any environmental condition discovered as a result of such testing

and examination, unless caused by the Purchaser.

\*    \*    \*    \*    \*    \*

Purchaser shall have 60 calendar days after Seller's execution of this Agreement (the "Inspection Period"), to determine in its sole discretion whether the Property supports the proposed purchase price. If Purchaser shall conclude that such is not the case, Purchaser shall so notify Seller prior to the expiration of the aforementioned period, and this Agreement shall terminate without liability on the part of Seller or Purchaser, except as otherwise expressly provided herein. Otherwise, this Agreement shall remain in effect, subject to the terms hereof.

Seller shall have one hundred and twenty (120) days from Seller's execution of this Agreement to determine in its sole discretion whether Purchaser's intended use of the Property will adversely affect the sale and/or development of Seller's adjacent property. If Seller, in his sole discretion, determines that it may do so, Seller may terminate this Agreement by written notice to Purchaser prior to expiration of the one hundred twenty (120) day period, whereupon the Deposit and all interest therein shall be returned to Purchaser.

7.1 This Agreement can be amended only in writing and supersedes any and all agreements between the parties hereto regarding the Property which are prior in time to this Agreement.

\*    \*    \*    \*    \*    \*

7.4 All tenders and notices required hereunder shall be made and given to either of the parties hereto at their respective addresses herein set forth and shall be effective as of the date of personal delivery, mailing by U.S. certified mail, return receipt requested, or delivery by a private contract carrier, as the case may be.

\*    \*    \*    \*    \*    \*

7.7 The performance and interpretation of this Agreement shall be controlled by the law of the State of Michigan.

\*    \*    \*    \*    \*    \*

7.10 If any action is brought by either party against the other party, the party in whose favor final judgment shall be entered shall be entitled to recover court costs incurred and reasonable attorneys.

The Agreement described R & HSC's proposed use of the Property as a retirement facility with 1,000 residential units and 250 health care beds.

On June 11, 1990, Maida succeeded Szoka as Archbishop. On October 2, 1990, Maida sent a letter to the president of R & HSC, which stated in relevant part:

I have determined that the sale of St. John's Seminary to your company and the intended use of that property may interfere with the sale and/or development of the surrounding property. As you know, specific provision was made in the Agreement of Purchase and Sale for cancellation of the Agreement if such a determination was made within 120 days from the Seller's execution of the Agreement.

This letter shall constitute written notice of termination pursuant to section 3 of the Agreement.

The letter was sent by U.S. certified mail, return receipt requested. On October 9, 1990, counsel for R & HSC sent a letter to Maida, stating that the letter of termination was not received until October 9, 1990 and asserting that the termination was untimely and ineffective. On October 17, 1990, R & HSC filed an Affidavit of Interest and Notice of Claim against the Property.

### III.

#### A.

Maida moves for summary judgment on the grounds that his letter of termination on October 2, 1990 was timely. Maida asserts that the letter of termination was sent 116 days from the Seller's execution of the Agreement and, therefore, within the 120 days provided in the Agreement.

Maida also asserts that, because section 3 of the Agreement provides that notice is "effective as of ... mailing by U.S. certified mail, return receipt requested," the termination was effective upon dispatch of the letter on October 2, 1990.

R & HSC responds that summary judgment is inappropriate because Maida has not produced evidence that the letter was actually dispatched on October 2, 1990, but only of the return receipt dated October 9, 1990. R & HSC asserts that Maida has failed to establish the absence of a genuine issue over this matter fact.

### B.

Maida submitted among his papers the receipt for certified mail number P–388–497–557 addressed to the president of R & HSC and postmarked October 2, 1990.[1] Also among his papers, Maida has submitted a copy of the envelope bearing the same certified mail number, addressed to the president of R & HSC, and postmarked October 2, 1990.[2]

### C.

■ The Court is satisfied that the unambiguous language of section 3 establishes that the timeliness of the letter of termination is measured by the date of dispatch if the method of notification is U.S. certified mail, return receipt requested. Maida has established that no genuine issue of material fact remains as to the date on which the letter of termination was dispatched. The letter of termination was, therefore, timely under the terms of the Agreement.

### IV.

### A.

Maida next asserts that the termination was effective as a proper exercise of the discretion reserved under the terms of the Agreement. Maida states that the Agreement permits the Seller "in his sole discretion" to terminate the Agreement upon a determination that the sale would adversely affect the Seller's adjacent property. Maida argues that the discretion reserved under the express, negotiated terms of the Agreement is controlling and not subject to any additional duty of good faith. *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038 (6th Cir.1990).

### B.

R & HSC responds that Maida's termination was an improper exercise of the authority reserved in the Agreement on two grounds. First, R & HSC observes that section 3 of the Agreement permits the Seller to terminate upon a determination that "Purchaser's intended use of the Property *will* adversely affect the sale and/or development of Seller's adjacent property." (emphasis added). R & HSC asserts that the Agreement thus subjects the discretion of the Seller to a duty to make a prior decision that there existed a distinct likelihood of an adverse impact on the adjacent property. R & HSC also asserts that, as a matter of law, the Seller was subject to a duty of good faith in the exercise of his discretion and that the termination was not made in good faith. *Burkhardt v. City National Bank*, 57 Mich.App. 649, 226 N.W.2d 678 (1975). R & HSC asserts that "a fair reading of the proposed undisputed facts" demonstrates that "Maida's decision to terminate was not based on a studied consideration of this problem or on a determination in accordance with the language of the Agreement."

### C.

■ In *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038 (6th Cir.1990), upon which Maida relies, Cessna intentionally allowed the time for renewal to pass, thus terminating its distributorship agreement with General Aviation. The Cessna–General Aviation agreement authorized both parties to terminate or decline to renew their agreement. The Court of Appeals for the Sixth Circuit affirmed the decision of the District Court that an im-

---

**1.** See Exhibit 8 of Plaintiff's Counter–Statement of Material Facts.

**2.** See Exhibit 10 of Plaintiff's Counter–Statement of Material Facts.

plied duty of good faith may not be imposed in contravention of contrary express contract terms. The Court stated:

> General Aviation and Cessna both entered into this agreement freely. If General Aviation had wanted specific provisions in the contract concerning what cause would be necessary for termination of the agreement, it could have insisted on the inclusion of those terms. There is no indication that either of the parties acted in bad faith "at the time [they] bargained for the termination right." In fact, as discussed above, General Aviation itself had a way out of the contract if it so desired.... The terms of that section of the contract could not be any clearer, and, because neither party acted in bad faith at the outset of contracting, the implied duty of good faith is inapplicable in this case.

915 F.2d at 1041–42 (quoting *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 938 (6th Cir.1989)).

In *Burkhardt v. City National Bank*, 57 Mich.App. 649, 226 N.W.2d 678 (1975), upon which R & HSC relies, a mortgage agreement authorized the bank to estimate the amount necessary to provide adequate escrow funds for the payment of taxes and insurance on the mortgaged property. The Michigan Court of Appeals reasoned that "[w]here a party to a contract makes the manner of its own performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." 57 Mich.App. at 652, 226 N.W.2d 678 (citing Corbin, Contracts, § 644, pp. 78–84). The Court concluded that the bank's authority to make estimates and escrow funds accordingly constituted a matter of discretion subject to a duty of good faith.

### D.

R & HSC's reliance upon *Burkhardt* is misplaced. In *Burkhardt*, the bank's authority to make and enforce estimates gave it discretion in identifying the mortgagor's obligations. In the case at bar, the duties of both parties are set forth with specificity and neither party's duties are defined by the exercise of the discretion reserved to the other party.

■ The Court is persuaded that *General Aviation* is applicable and controlling in this case. The discretion reserved by the parties to the Agreement is limited to determining whether they wished to proceed. Both parties reserved the right, "in [their] sole discretion," to terminate the Agreement. This right was the subject of negotiation and the reservation of this discretion by both parties was unambiguously stated in the Agreement freely entered into by the parties. There being no indication of bad faith by either party in the negotiation of the Agreement, the Court will not now impose a implied duty of good faith upon the exercise of the expressly reserved discretion of the parties to terminate the Agreement.

### E.

The discretion reserved by the Seller, although not subject to an implied duty of good faith, is limited by the terms of the Agreement. R & HSC overstates the limitations placed on the discretion of Seller by Section 3 of the Agreement. Looking to the words "will adversely affect" in the first sentence of Section 3, R & HSC asserts that the Seller was obliged to make a prior decision that there existed a distinct likelihood of an adverse impact on the adjacent property.

■ While the first sentence identifies the nature of the Seller's discretion, the second sentence provides the standard: "If Seller, in his sole discretion, determines that it *may* do so, Seller may terminate this Agreement...." Maida's decision that the sale may adversely affect the adjacent parcel is not *ipse dixit*, nor is that decision sustainable only if the Court accepts and agrees with its wisdom. R & HSC urges the Court to read the Agreement to require that the Seller reach an "informed decision," or exercise "best judgment," or engage in "reasoned decision making." Such nomenclature is directed at an inquiry into the whether the quantum of information upon which Maida based his decision to terminate was sufficient and whether the

decision was wise. However, such an inquiry does not accord with the terms of the Agreement.[3]

██ The determination of the Seller that proceeding under the Agreement may adversely affect the adjacent parcel is subject to minimal judicial review to assure that the Seller has not acted capriciously. It is not disputed that Sister Mary Knob and Gerald Chuhran, members of Archbishop's staff, were opposed to the transaction when it was executed by Szoka and subsequently expressed their concerns to Maida. In his deposition, Maida stated that the advice of his staff factored into his judgment. Maida also expressed concerns over the affects that the presence of retirement community on the Property could have on the zoning and compatible uses of the adjacent parcel.[4] The Court is satisfied, based on the undisputed facts, that Maida's decision was not capricious.

### F.

The Court is persuaded that the right of termination reserved by the parties under the terms of the Agreement is not subject to an additional, implied duty of good faith. The Court is satisfied that no genuine issue of material fact remains as to whether Maida's exercise of that discretion to terminate was grounded in a determination that the sale would adversely affect the adjacent parcel and that Maida's decision was not capricious. The termination of the Agreement by letter of October 2, 1990 was effective.

### V.

### A.

R & HSC asserts that Maida is not the title owner of the Property and, therefore:

(1) was without authority to exercise the right of termination reserved by the Seller in the Agreement, and, (2) is not a proper party to bring this action to quiet title. In support, R & HSC asserts that Szoka, before executing the Agreement, was required to consult with the Presbyterial Council and obtain the consent of Pope John Paul II. R & HSC argues that the Vatican exercised dominion and control over the property.

### B.

██ Michigan law identifies the Archbishop of the Archdiocese of Detroit as the record owner of the Property with the authority to contract for its conveyance. M.C.L.A. § 458.2 provides, in relevant part:

The archbishop of the Roman Catholic archdiocese of Detroit and the several bishops of the Roman Catholic dioceses within the state of Michigan and their successors in office and administrators of the Roman Catholic dioceses within the state of Michigan, for the purposes of administering the property held by them respectively under this act and in respect thereto, are declared to have and to have had power:

(a) To enter into any and all lawful contracts in respect of the property held by them;

(b) To sue and be sued, complain and defend, in any court, or to be a party to any proceedings before any board, tribunal, commission, or any other public body;

(c) For the purposes of the Roman Catholic church to acquire, purchase, hold, convey lease, mortgage, and in every way deal in real and personal

---

**3.** R & HSC also asserts that Maida's letter of October 2, 1991 did not state that the sale "will" adversely affect the adjacent parcel, but merely stated that it "may." Notwithstanding the Court's finding that "may" is the controlling term of Section 3, the Court is not persuaded to R & HSC's view that the exercise of the authority reserved to the Seller in Section 3 of the Agreement was dependent upon a particular incantation. The obvious intent of a party will not be defeated by a failure to use "magic words." *See, e.g., Pacific Gas & Electric Co. v.*

*G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 464, 442 P.2d 641 (1968).

**4.** *See* Standard Jury Instruction; Partial Taking. SJI2d 90.12. Various factors are considered in determining the effect of a partial taking on the value of the remaining parcel, including: its reduced size, altered shape, reduced access, any change in its utility or desirably, the effect of the applicable zoning ordinances, and the use of the condemned portion.

property of all kinds without limitations; the power to hold real and personal estate shall include the power to take the same by gift, devise, bequest, and upon trusts, either express or implied.

### C.

The Agreement is executed between R & HSC and the Archbishop of the Archdiocese of Detroit. By its terms, the discretionary right of termination was reserved to the Archbishop. Whether the Archbishop is required to secure the approval of the Vatican to sell Church property, or to terminate an agreement to sell Church property, does not affect the statutory status of the Archbishop as the title holder of the Property or the statutory authorities of the Archbishop to contract for the conveyance the Property.

Maida is clearly a proper party plaintiff in the instant action pursuant to M.C.L.A. § 458.2(b). R & HSC's assertion to the contrary is without merit.

### VI.

 R & HSC asserts that the Court lacks subject matter jurisdiction because the amount in controversy is not greater than $50,000. The controversy here is the ownership of a parcel valued in the Agreement at $5,500,000. The Court is satisfied that the jurisdictional amount is in controversy.

### VII.

### A.

The Court is presented with a collection of over-drawn legal arguments that would conceal the obvious. Both parties to the Agreement negotiated for and expressly reserved the right, in their sole discretion and under certain broadly defined circumstances, to elect to terminate the Agreement. By the nature and structure of the Agreement, the Archbishop assumed the risk that R & HSC would exercise its right to discontinue the sale. Conversely, R & HSC assumed the risk that Szoka or his

successor would discontinue the sale. While the fact that Szoka's successor exercised the right to discontinue the sale may give R & HSC cause to be disappointed,[5] whether R & HSC is now dissatisfied is of no consequence to discerning the character of the risk it assumed when the Agreement was executed.

### B.

For the reasons stated, the Court is satisfied that Maida possessed the authority to exercise the right of termination reserved by the Seller under the terms of the Agreement; the exercise of that right of termination was timely; and the exercise of the *right of termination was proper and effective.* Therefore, Maida's motion for summary judgment is GRANTED and R & HSC's motion is DENIED. Maida's request for costs and fees, as provided under section 7.10 of the Agreement, *supra,* is GRANTED.

SO ORDERED.

---

5. "Now there arose a new king over Egypt, who knew not Joseph." Exodus 1:9.