36 F.3d 1097
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Adam J. MAIDA, Roman Catholic Archbishop of the Archdiocese
of Detroit, Plaintiff-Appellee, Cross-Appellant,
v.
RETIREMENT AND HEALTH SERVICES CORPORATION, a Maryland
Corporation, Defendant-Appellant, Cross-Appellee.
 Nos. 93-1625, 93-1635.
 United States Court of Appeals, Sixth Circuit.
 Sept. 19, 1994.
 
 Before: MARTIN, NELSON, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an action to quiet title to a piece of real estate. The plaintiff, the Roman Catholic Archbishop of Detroit, had agreed to sell the property to the defendant, a developer. The Archbishop reserved the right to terminate the contract within a specified period if he concluded, in his sole discretion, that the purchaser's intended use of the property might adversely affect the sale or development of adjoining church property. The Archbishop exercised his option to terminate shortly before the option would have expired, and the developer subsequently recorded a notice of claim against the property. This lawsuit followed.
 
 
 2
 The district court granted summary judgment to the Archbishop, removing the cloud from the Archbishop's title and awarding him attorney fees (in a lesser amount than requested) pursuant to a provision of the contract. The developer appeals the summary judgment, and both parties appeal the attorney fee award. Among the numerous issues presented on appeal are these: (1) whether the defendant should have been permitted to go to trial on the question whether the Archbishop violated a duty of good faith in terminating the contract, and (2) whether the district court abused its discretion in the award of attorney fees. Answering both questions in the negative, and finding none of the defendant's remaining contentions persuasive, we shall affirm the district court's disposition of the case.
 
 I.
 
 3
 The Roman Catholic Archdiocese of Detroit owned a 37-acre parcel of improved land in western Wayne County, Michigan. The Archbishop held legal title to the property, which had once been used for a seminary. Adjacent to the seminary parcel was a 137-acre tract that the Archdiocese had leased to a private corporation for use as a golf course.
 
 
 4
 The Archdiocese undertook to sell the smaller parcel, and the defendant, Retirement and Health Services Corporation (R & HSC), expressed interest in purchasing it for development as a retirement community. On June 8, 1990, Edmund Cardinal Szoka, then the Archbishop of Detroit, executed an agreement to sell the parcel to R & HSC. The company placed $50,000 in an escrow account pursuant to the contract.
 
 
 5
 Paragraph 3 of the contract gave each party a right of termination under certain conditions. In the Archbishop's case, he had 120 days from the execution of the contract
 
 
 6
 "to determine in [his] sole discretion whether Purchaser's intended use of the Property will adversely affect sale and/or development of Seller's adjacent property. If Seller, in his sole discretion, determines that it may do so, Seller may terminate this Agreement by written notice to Purchaser prior to expiration of the one hundred twenty (120) day period, whereupon the Deposit and all interest thereon shall be returned to Purchaser." Id.
 
 
 7
 Prior to entering into the contract, R & HSC learned that Cardinal Szoka had been appointed to a post in the Vatican and would soon be leaving his position in Detroit. On June 11, 1990, three days after Cardinal Szoka signed the contract, the plaintiff, Adam J. Maida, succeeded him as Archbishop.
 
 
 8
 On October 2, 1990, the new Archbishop sent a letter to R & HSC by certified mail, return receipt requested, stating that he had determined that the sale of the property to R & HSC and the intended use of the property "may interfere with the sale and/or development of the surrounding property" and that he was therefore canceling the agreement. The president of R & HSC, John Erickson, signed a receipt for the letter on October 9, 1990. On October 17 Mr. Erickson filed for recordation with the local Register of Deeds an "Affidavit of Interest and Notice of Claim" stating that R & HSC had an interest in the seminary site.
 
 
 9
 On June 14, 1991, Archbishop Maida filed a complaint against R & HSC in the United States District Court for the Eastern District of Michigan. The complaint invoked the court's diversity jurisdiction and asked that the Archbishop be adjudged owner of record and that the defendant's notice of claim be removed from the real estate records. The complaint also sought damages and attorney fees. R & HSC filed a counterclaim for breach of contract. Following discovery, the parties filed cross-motions for summary judgment.
 
 
 10
 On May 29, 1992, the district court filed an opinion granting Archbishop Maida's motions for summary judgment and for costs and attorney fees. Maida v. Retirement and Health Services Corp., 795 F.Supp. 210 (E.D.Mich.1992). On October 6 the court entered a partial judgment declaring that the Archbishop held title to the parcel and ordering that the notice of claim be removed from the county records. After denying motions by R & HSC to alter or amend the judgment and to reconsider the award of attorney fees, the court entered final judgment on March 26, 1993. Archbishop Maida was awarded $44,245.96 in attorney fees and expenses. Both parties filed timely appeals.
 
 II.
 A.
 
 11
 R & HSC argues that the $50,000 amount-in-controversy requirement of the diversity statute, 28 U.S.C. Sec. 1332, not been satisfied. In an action to quiet title, however, the amount in controversy is the value of the land. 14A Wright, Miller and Cooper, Federal Practice & Procedure Sec. 3702 p. 40; Smith v. Adams, 130 U.S. 167, 175 (1889); A.C. McKoy, Inc. v. Schonwald, 341 F.2d 737, 739 (10th Cir.1965). The complaint in this case sought to quiet title to a parcel of property valued at $5.5 million, so the jurisdictional amount has been satisfied.
 
 B.
 
 12
 R & HSC maintains that the Archbishop was permitted to terminate the contract only if he determined that the use of the property "will adversely affect" the sale and/or development of the adjoining property. Because the Archbishop's letter stated only that the development "may interfere" with the sale or development of the property, R & HSC argues, the letter did not comply with paragraph 3 of the contract.
 
 
 13
 It is true that paragraph 3 speaks of the seller's determining, in his sole discretion, that the intended use "will" adversely affect sale or development. The paragraph goes on to provide, however, that "[i]f Seller, in his sole discretion, determines that [the intended use of the property] may [adversely affect sale and/or development of the adjoining proeprty], Seller may terminate this Agreement." (Emphasis supplied.) The sentence that authorizes termination thus does not require a determination that the intended use will adversely affect sale or development; a determination that it "may" do so is all that is needed. The Archbishop made such a determination, and his letter of termination adequately reflects that fact. It makes no difference, of course, that the Archbishop used the verb "interfere" rather than "affect."
 
 
 14
 Next, R & HSC contends that Archbishop Maida did not comply with a supposed contractual duty to develop a master plan for the adjoining property. But the contract merely refers to a master plan that a consultant to the Archbishop was developing independent of the contract; the contract does not impose an obligation on the Archbishop to develop such a plan.
 
 
 15
 When he mailed his notice of termination, Archbishop Maida did not return the $50,000 that R & HSC had placed in escrow. R & HSC contends that this omission rendered the notice ineffective. We are not persuaded. Termination of the contract was not conditioned on the Archbishop's retrieving the deposit from the escrow agent and returning it to R & HSC. The contract stated "Seller may terminate this Agreement by written notice to Purchaser ... whereupon the Deposit and all interest thereon shall be returned to Purchaser." Termination was thus effective on the giving of written notice, and R & HSC was entitled to return of the deposit thereafter. The contract sets forth a procedure through which R & HSC can recover its deposit, starting with a request addressed to the bank where the deposit is held in escrow. R & HSC has yet to request return of the deposit from the bank.
 
 
 16
 R & HSC contends that Archbishop Maida had no authority to terminate the contract because he himself was not a party and because the seller's rights were not assignable without written permission from R & HSC. By its express terms, however, the contract was binding on the contracting parties' successors. Cardinal Szoka did not execute the contract in his personal capacity, and when Archbishop Maida succeeded Cardinal Szoka as Archbishop, he succeeded not only to legal title to the real estate (see Mich.Comp.Laws Sec. 458.2) but also to the rights given the Archbishop under the contract.
 
 
 17
 R & HSC further complains that Archbishop Maida blocked access to the property on October 8, 1990, in violation of a contractual obligation to provide access. When Archbishop Maida terminated the contract, however, the obligation to provide access terminated with it.
 
 
 18
 R & HSC maintains that the Archbishop's letter of termination was not timely. The contract gave the Archbishop until October 6--120 days after the June 8 execution date--to exercise his termination right. The contract further provided that notice "shall be effective as of the date of ... mailing by U.S. certified mail." There is no question of fact as to whether the Archbishop mailed the termination letter by October 6. All the evidence shows that the termination letter was sent by certified mail on October 2. The record contains a receipt for certified mail addressed to John Erickson of R & HSC with a Post Service stamp dated October 2. John Erickson acknowledges having received the letter on October 9, and a receipt dated October 9 is also in the record. R & HSC offers no evidence whatsoever to suggest that the certified letter sent on October 2 was anything other than Archbishop Maida's notice of termination.
 
 C.
 
 19
 We turn now to a more substantial issue, the claim by R & HSC that the Archbishop violated an implied duty of good faith. The contract permitted the Archbishop to terminate the contract, as we have seen, if he determined "in his sole discretion" that the intended use of the property might adversely affect the sale or development of the adjacent property. R & HSC contends that notwithstanding the "sole discretion" language, the Archbishop was under an implied duty to exercise good faith in determining whether to exercise the right of termination. The company further contends that there is a disputed issue of fact as to whether the Archbishop acted in good faith.
 
 
 20
 R & HSC relies on the case of Burkhardt v. City Nat'l Bank of Detroit, 57 Mich.App. 649, 226 N.W.2d 678 (1975), in which a bank's mortgage agreement with the plaintiff-borrowers provided that the bank would require monthly payments into an escrow account to pay taxes and insurance. The agreement provided that the plaintiffs would pay "a sum estimated by the [bank] to be sufficient to pay all general taxes ... and premiums for ... insurance." Id. at 652, 226 N.W.2d at 680. The plaintiffs objected to the bank's method for estimating escrow payments. The court stated that "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith. See 3A Corbin, Contracts, Sec. 644, pp. 78-84." Id. A number of other cases have likewise held that Michigan law imposes a duty of good faith in connection with a party's exercise of discretion under a contract. See Ferrell v. Vic Tanny Int'l, Inc., 137 Mich.App. 238, 357 N.W.2d 669, appeal denied, 419 Mich. 961 (1984) (where contract provided that health club members must follow club's new regulations, club must use good faith in issuing such regulations); Sims v. Buena Vista School Dist., 138 Mich.App. 426, 430, 360 N.W.2d 211, 213 (1984) (where contract permitted school district to decide whether to extend life insurance coverage to laid-off employees, "the law implied a requirement that [the school district] exercise that discretion honestly and in good faith"); ParaData Computer Networks v. Telebit Corp., 830 F.Supp. 1001, 1005 (E.D.Mich.1993) ("if [a contracting party's] performance was a matter of its own discretion, then this court will imply the covenant [of good faith and fair dealing]").
 
 
 21
 The Archbishop and the district court relied on another line of cases to support the conclusion that the Archbishop was under no duty to exercise good faith. In General Aviation v. Cessna Aircraft Co., 915 F.2d 1038 (6th Cir.1990), the parties entered into a one-year distributorship agreement that was renewed several times. The contract was renewable at the parties' option, but if neither party took affirmative action to renew the contract, it would automatically terminate. Cessna intentionally allowed time for renewal to pass, thereby terminating the contract. Id. at 1039. We held that Cessna's right to terminate through nonrenewal was not subject to an implied duty of good faith. Id. at 1041. An implied duty of good faith cannot override express contractual terms, and the contract provided that either party could terminate without cause. See also Cloverdale Equipment Co. v. Simon Aerials, Inc., 869 F.2d 934 (6th Cir.1989).
 
 
 22
 The Archbishop argues that because the contract gave him "sole discretion" to terminate, the exercise of that discretion was not fettered by an implied duty of good faith. In any event, he adds, there is no evidence that he acted in bad faith.
 
 
 23
 The district court largely adopted the Archbishop's view of this issue, stating as follows:
 
 
 24
 "In the case at bar, the duties of both parties are set forth with specificity and neither party's duties are defined by the exercise of the discretion reserved to the other party.... The discretion reserved by the parties to the Agreement is limited to determining whether they wished to proceed. Both parties reserved the right, 'in [their] sole discretion,' to terminate the Agreement." Maida, 795 F.Supp. at 214.
 
 
 25
 The court went on to conclude that the Archbishop's decision to terminate the agreement was "subject to minimal judicial review to assure that the Seller has not acted capriciously." Id. at 215. Concluding that the Archbishop's decision was not capricious, the court granted summary judgment to Archbishop Maida on this issue. Id.
 
 
 26
 We agree with the district court that Archbishop Maida was entitled to summary judgment, but we base our conclusion on slightly different grounds. We need not decide whether the Archbishop was bound to exercise his discretion in good faith, because we find no evidence that he failed to do so in any event. Usually the question of whether a party has acted in good faith is one for the jury, but summary judgment may be proper if the plaintiff cannot offer any evidence suggesting bad faith. See Vic Tanny, 137 Mich.App. at 243-44, 357 N.W.2d at 673, where the court granted summary judgment to the defendant because the plaintiffs had not alleged any facts indicating that the defendant had acted in bad faith.
 
 
 27
 The Michigan Supreme Court has defined bad faith as "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty." Commercial Union Ins. Co. v. Liberty Mutual Ins. Co., 426 Mich. 127, 136, 393 N.W.2d 161, 164 (1986). Whether bad faith can be shown depends upon the facts of each case. In re Green Charitable Trust, 172 Mich.App. 298, 315, 431 N.W.2d 492, 499 (1988). Bad faith may exist in the absence of dishonesty or fraud. However, "claims of bad faith cannot be based upon negligence or bad judgment, so long as the actions were made honestly and without concealment." Commercial Union, 426 Mich. at 137, 393 N.W.2d at 164.
 
 
 28
 Archbishop Maida gave a deposition in which he testified to concern that the sale of the 37-acre site to R & HSC would burden the adjoining property with easements. The Archbishop stated that he was concerned that these easements would hinder his ability to sell or develop the adjoining property. He said that "there were certain easements that were part of the [purchase] agreement which I was told would adversely [a]ffect the use of that [adjoining] property or the future sale of it.... I was told it that [sic] would adversely [a]ffect the use or disposition of that property along the line." And "if these easements are substantial," he observed, "obviously they would [a]ffect [the adjoining property], and that's what I was given to understand they were."
 
 
 29
 On the face of the record, the bona fides of the Archbishop's determination that the granting of easements on the adjoining property would adversely affect the property appears unassailable. The Archbishop may have been misinformed about the easements, but there is no evidence that he lied under oath when he described his understanding in this regard.
 
 
 30
 R & HSC points to several factors as indicating that the Archbishop acted in bad faith. First, R & HSC observes that the Archbishop made his decision against the advice of several of his advisors who recommended that the sale proceed. (The evidence shows, however, that others of his advisors were opposed to the sale.) Second, R & HSC contends that Archbishop Maida did not conduct an adequate investigation to determine whether the proposed use of the property would adversely affect the adjoining property. The company points out that Archbishop Maida discussed the subject only briefly with a few people, that he obviously did not understand the nature and extent of the easements about which he expressed concern, and that he waited until the last minute to exercise his option to terminate.[1] But none of this is sufficient to create a genuine issue of material fact as to whether the Archbishop acted in bad faith. The Archbishop may well have acted negligently, but there has been no showing that his actions were "arbitrary, reckless [or] indifferent" or that he acted in intentional disregard of R & HSC's interests. In the absence of any evidence establishing a genuine issue as to whether Archbishop Maida acted in bad faith, we conclude that the Archbishop was entitled to summary judgment on this issue.
 
 III.
 A.
 
 31
 The district court awarded attorney fees pursuant to paragraph 7.10 of the contract, which provides as follows: "If any action is brought by either party against the other party, the party in whose favor final judgment shall be entered shall be entitled to recover court costs incurred and reasonable attorneys' fees." R & HSC argues that if the contract was properly terminated, the Archbishop's right to attorney fees expired with the contract. There is no right to recovery of the fees at issue here, the argument runs, because all of these fees were incurred after termination.
 
 
 32
 The district court concluded that the attorney fees provision survived the contract's termination. We agree. The provision is not, by its terms, limited to the recovery of fees incurred in actions brought before the mailing of a notice of termination, and the most reasonable interpretation is that the provision applies to fees in "any action" brought to determine the parties' rights and duties under the contract. Other provisions of the contract are consistent with this interpretation. For example, the contract contemplates that following termination R & HSC could still rely on the contract to recover its deposit.
 
 
 33
 Although Archbishop Maida's action was filed several months after the termination of the contract, the cause of action clearly arose out of the contract. As the district court characterized the action, it was "one for wrongful interference with the exercise of the contractual right to discontinue the sale." R & HSC filed a counterclaim alleging breach of contract, thereby raising additional issues as to the parties' rights and liabilities under the contract. If R & HSC had initiated litigation by filing a breach of contract action, instead of recording a notice of claim, and if Archbishop Maida had prevailed in that action, there is little doubt that the Archbishop would have been entitled to attorney fees under the contract. "Who wins the race to the courthouse is not dispositive of the entitlement to attorney's fees. That issue hinges on which of the parties prevails--not who institutes the civil action." Ayotte v. Redmon, 718 P.2d 1164, 1165 (Idaho 1986).
 
 
 34
 In general, the decided cases dealing with this issue look to the parties' intentions to determine whether the attorney fee provision survives. Some courts have held that the termination of a contract rendered an attorney fee provision inapplicable. See Quealy v. Anderson, 714 P.2d 667 (Utah 1986) (accord and satisfaction terminated entire contract, including attorney fee provision); Ellis v. Butterfield, 570 P.2d 1334 (Idaho 1977) (distinguished by Ayotte v. Redmon, supra ). The more widely-held view, however, is that an attorney fee provision applies to an action to determine the parties' rights and duties under the contract notwithstanding the contract's termination. See Ayotte v. Redmon, 718 P.2d at 1164; Katz v. VanDerNoord, 546 So.2d 1047, 1049 (Fla.1989); LeClair v. Reiter, 760 P.2d 740, 743 (Mont.1988); Woodruff v. McClellan, 622 P.2d 1268, 1270 (Wash.1980).
 
 
 35
 Further support for this view is found in Nolde Bros. v. Local 358, Bakery & Confectionery Workers Union, 430 U.S. 243 (1977), in which the Supreme Court of the United States held that an arbitration provision in a collective bargaining agreement survived the termination of the agreement unless a different intent was expressly manifested. Although Nolde did not involve an attorney fee provision, the rationale is instructive:
 
 
 36
 "Nolde contends that the duty to arbitrate, being strictly a creature of contract, must necessarily expire with the collective-bargaining contract that brought it into existence. Hence, it maintains that a court may not compel a party to submit any post-contract grievance to arbitration for the simple reason that no contractual duty to arbitrate survives the agreement's termination.... [However,] there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract.... While the termination of the collective-bargaining agreement works an obvious change in the relationship between employer and union, it would have little impact on many of the considerations behind their decision to resolve their contractual differences through arbitration.... Hence, there is little reason to construe this contract to mean that the parties intended their contractual duty to submit grievances and claims arising under the contract to terminate immediately on the termination of the contract.... [T]he parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship. In short, where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." Id. at 250-55.
 
 
 37
 In Litton Financ. Printing Div. v. NLRB, 115 L.Ed.2d 177, 196-98, 111 S.Ct. 2215, 2224-26 (1991), another case presenting the question of whether an arbitration clause survived the termination of a collective bargaining agreement, the Court stated that "if a dispute arises under the contract here in question, it is subject to arbitration even in the postcontract period.... We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement."
 
 
 38
 The logic of Nolde applies with equal force to the case at bar. The parties' wish that a prevailing party recover its attorney fees was not likely to evaporate if the dispute arose out of termination of the contract. We therefore conclude that Archbishop Maida was entitled to recover his reasonable attorney fees.
 
 B.
 
 39
 Both parties object to the dollar amount awarded by the district court. The partners in the law firm representing the Archbishop charged him only half their usual hourly billing rate. (The Archbishop was not given any discount on fees for work performed by associates and paralegals.) The petition for fees requested an award based on the firm's usual rates or prevailing market rates for similar work, rather than the reduced fee the Archbishop actually paid. The district court awarded only the actual fees, and we conclude that this was not an abuse of discretion.
 
 
 40
 The intent of the parties in including an attorney fee provision was to permit "recover[y]" of expenses and fees incurred in litigation, insofar as they were reasonable. Fees that were never paid could hardly be recovered, and the contract contains no indication of any intent to reward the prevailing party with a windfall profit.
 
 
 41
 R & HSC complains that the award included fees for matters not within the scope of the attorney fee provision. For example, it argues that the court should have excluded from the award any attorney fees associated with a slander of title claim that Archbishop Maida had filed and then later voluntarily dropped. It also objects to certain discovery costs, argues that the number of hours claimed was excessive, and refers in its brief on appeal to the "numerous other objections" that it raised before the district court. Like the district court, we find none of the defendant's objections persuasive.
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 R & HSC also notes that the 37-acre site was later sold to a different developer, who ended up building a retirement home. The Archbishop apparently sold the entire property--the 37-acre site, as well as the adjoining 137-acre site--to the new developer. The sale occurred after the district court rendered summary judgment, however, and this circumstance is not properly before this court on review
 It is true that we have on occasion taken "notice of changes in fact or law occurring during the pendency of a case on appeal which would make a lower court's decision, though perhaps correct at the time of its entry, operate to deny litigants substantial justice." Hawkes v. Internal Revenue Service, 467 F.2d 787, 793 (6th Cir.1972). R & HSC argues that the Archbishop's subsequent sale of the property to a different developer is a factual change that warrants remand. R & HSC has not persuaded us, however, that this new fact renders the district court's judgment unjust.